[Civ. No. 14942. Fourth Dist., Div. One. Apr. 21, 1978.]

CITY COUNCIL OF THE CITY OF SAN DIEGO,
Plaintiff and Appellant, v.
HUGH McKINLEY, as City Manager, etc., et al.,
Defendants and Respondents.

**COUNSEL**

McDonald, Riddle, Hecht & Worley, McDonald, Hecht & Worley and Donald R. Worley for Plaintiff and Appellant.

White, Price, Peterson & Robinson, Peterson, Gamer, Muns & Price, Paul A. Peterson and John D. Thelan for Defendants and Respondents.

**OPINION**

COLOGNE, J.—The City Council of the City of San Diego petitioned the superior court for a writ of mandamus against the city manager and the city auditor and comptroller seeking to compel the execution of an agreement with the landscape architectural firm of Wimmer, Yamada, Iwanaga & Associates (WYI). The agreement which had been approved by the city council called for the preparation of the design of a Japanese garden to be located in Balboa Park, owned by the city. The city manager had determined, on advice of the city attorney, that since Joseph Y. Yamada, president and stockholder of WYI was a member of the Park and Recreation Board (Board) of the city, the execution of such a contract would be contrary to the city charter and a conflict of interest for Yamada. The superior court denied the petition for the writ of mandamus holding such a contract would be void.

The parties stipulated to a detailed statement of facts and there was no evidence offered except as contained in the stipulation. We will summarize the contents of the stipulation in order to present the setting for this opinion.

On November 8, 1966, the electorate of the City of San Diego approved a bond issue authorizing $23,865,000 for the construction of park and recreation facilities in the city. Thirty-two percent of this amount was to be apportioned for the development of Balboa Park. Included among the projects at Balboa Park was a mall-organ pavilion in the Palm Canyon area consisting of installation of walkways, irrigation, lights and shade plantings adjacent to and south of the House of Hospitality in the park. At this time there was a Japanese garden located in the children's zoo of the park but the concept of a Japanese garden in Balboa Park was reconsidered. On June 12, 1968, the Board considered the proposal of San Diego Yokohama Friendship Board for a Japanese garden to be located in the Gold Gulch area to the south of the House of Hospitality. The Balboa Park committee reported it had approved the general concept of a Japanese tea garden and recommended that the Board refer the proposal to the staff for further study. The Board voted in accordance with that recommendation.

On July 10, 1968, the Board voted to go on record as approving the development of a Japanese garden south of the House of Hospitality. The San Diego Yokohama Sister City Society had announced a plan to donate a Japanese gate as an entrance to the proposed tea garden and

the Board minutes reflect that the gate should be used for that purpose. The Board voted to recommend acceptance of the gate and the proposal to locate it in the east side of the mall, south of the House of Hospitality and north of the organ pavilion. The gate was donated on March 19, 1969, and on April 8 it was accepted by the city.

In 1971 David Roberts, park division superintendent, proposed that the city retain consultants to develop a plan for this part of the park. The architectural firm of Brink and Roberts was retained to formulate a general development plan for the improvement of Gold Gulch in Balboa Park. The report of Brink and Roberts was received in April 1972 and showed a plan containing the Japanese garden in the area earlier suggested by the Board.

In April 1972 Mayor Wilson nominated Yamada for membership to the Board, and that appointment was confirmed. Yamada had not participated in the project up to this time.

It was stipulated that Yamada was and now is president, a director and stockholder with an interest of more than $1,000 in the firm of WYI. At the time of Yamada's appointment to the Board the director of parks and recreation orally advised Yamada that in view of Yamada's position on the Board, neither he nor his firm would be eligible for contracts with the city.

Yamada was named chairman of the facilities committee which is one of the functional committees of the Board established to review the design, architecture, landscaping and technical planning of all facilities being studied by the Board and to advise the Board. The facilities committee includes structural engineers, architects, landscape architects, contractors, and artists. The committee's job was to review the suitability of a given design to meet the program needs, consider the esthetics of a proposed design including landscaping, site-planning, exterior elevations and interior treatment of structures and advise the staff and the Board. Yamada was the only member of the facilities committee who was also a member of the Board.

On October 17, 1972, the plan submitted by Brink and Roberts was shown to the facilities committee, and Yamada voted with the majority of the committee to recommend approval of the plan subject to the review of future plans before development. On November 21, the plan was presented to the Board. At that meeting Yamada moved that the

plan be approved in concept subject to landscape plans and the motion was carried.

In 1974 the city manager invited proposals for the design contracts for the various areas in the general development plan. The nominating committee reviewed the resumes of the firms applying for architectural and engineering consultant contracts and proposed three firms. David Roberts of Brink and Roberts individually interviewed the representatives of the nominated firms including that of WYI and recommended WYI be awarded the design contract for the Japanese garden. This contract involves a cost to the city of $20,500. After some negotiation between Iwanaga of WYI and Vincent Marchetti, project officer of the park and recreation department, the terms were agreed upon and the contract was prepared. This agreement did not follow the standard form agreement normally used by the city.

On January 23, 1975, the city council first considered the award of the contract for these services and in July 1975 the council authorized the city manager to execute the agreement with WYI.

The city manager, on advice of the city attorney, refused to execute the agreement on the sole ground the contract is void under the San Diego City Charter due to the existence of a conflict of interest. The city auditor and comptroller indicated he would refuse to honor the claims for payment on the contract for the same reason.

Our consideration is whether the execution of this contract violates section 94 of the San Diego City Charter. The San Diego City Charter, section 94, reads in pertinent part as follows:

"No officer, whether elected or appointed, of The City of San Diego shall be or become directly or indirectly interested in, or in the performance of, any contract with or for The City of San Diego . . . . No officer, whether elected or appointed, shall be construed to have an interest within the meaning of this section unless the contract . . . shall be with or for the benefit of the office, board, department, bureau or division with which said officer is directly connected in the performance of his duties and in which he or the office, board, department, bureau or division he represents exercises legislative, administrative or quasi-judicial authority in the letting of or performance under said contract . . . .

"All contracts entered into in violation of this Section shall be void and shall not be enforceable against said City . . . ."

We are called upon first to determine whether Yamada is a city officer within the meaning of this section.

The term officer, in its common acceptation, is sufficiently comprehensive to include all persons in any public station or employment conferred by government (*Vaughn* v. *English,* 8 Cal. 39, 41). *Coulter* v. *Pool,* 187 Cal. 181, 186-187 [201 P. 120], narrowed the definition considerably, however, and has become the leading authority in this area. The court there states: "Its definition and application depend not upon what the particular office in question may be called, nor upon what a statute may call it, but upon the power granted and wielded, the duties and functions performed and other circumstances which manifest the true character of the position and make and mark it a public office, irrespective of its formal designation. [Citations.] A public office is ordinarily and generally defined to be the right, authority, and duty, created and conferred by law, the tenure of which is not transient, occasional, or incidental, by which for a given period an individual is invested with power to perform a public function for the benefit of the public. [Citation.] A public officer is a public agent and as such acts only on behalf of his principal, the public, whose sanction is generally considered as necessary to give the act performed by the officer the authority and power of a public act or law. The most general characteristic of a public officer, which distinguishes him from a mere employee, is that a public duty is delegated and entrusted to him, as agent, the performance of which is an exercise of a part of the governmental functions of the particular political unit for which he, as agent, is acting."

It is apparent now there are two requirements for a public office; first, a tenure of office which is not transient, occasional, or incidental but is of such nature that the office itself is an entity in which incumbents succeed one another and which does not cease to exist with the termination of incumbency and, second, the delegation to the officer of some portion of the sovereign functions of government either legislative, executive, or judicial (*Spreckels* v. *Graham,* 194 Cal. 516, 530 [228 P. 1040]).

Since the Board members are elected for a term of two years and until their successors are appointed (Mun. Code, § 26.30(b)) it is

apparent the office is not transient, occasional, or incidental. The Board has continuing existence with provision for succession of officeholders. There is no limitation to the continued life of this particular Board.

The Board serves a definite function for the improvement of government in the City of San Diego, and those purposes are more specifically defined in the ordinance authorized by the charter, section 26.31 of the San Diego Municipal Code.

"The powers and duties of the Park and Recreation Board shall be as follows:

"(a) Advise the City Council through the City Manager on public policy matters relating to the acquisition, development, maintenance and operation of parks, beaches, playgrounds and recreational activities in the City of San Diego.

"(b) Periodically review the recreational program of the City in relation to the needs and desires of the citizens.

"(c) Coordinate the work of such committees as may be established towards the end of developing integrated and balanced policy recommendations.

"(d) Conduct such investigations, studies and hearings which, in the judgment of the Board, will aid in effectuating its general purposes."

It is apparent the Board has the authority to investigate and advise the council in its legislative role on the matters of development of parks and recreation within the city. In doing so through the city manager the Board casts its influence on the city manager, the executive officer of the city, in the administration of the parks and recreation program in the city. The Board thus has a dual function of advising both the legislative as well as the administrative functions of government.

Section 43 of the San Diego City Charter says all members of such boards (advisory) shall be appointed by the mayor with council confirmation and the terms of "office" of such members may be extended beyond the term of the appointing mayor. Thus, by designating such members as holders of office the charter attributes to all the members of the board the title "officers."

The members of the Board are officers within the definition of section 94 of the charter.

Clearly, the operation of the contract for the design of a Japanese garden in the city park system benefits the city and its agencies. We need not dwell on the fact that the solving of any problem in the city relative to parks eliminates the necessity for further inquiry and study or advisement to the council and therefore benefits the Board. That fact speaks for itself.

The remaining question before us then is whether the office exercises any legislative, administrative or quasi-judicial authority in the letting of or in the performance under said contract. The word "let" means to "make" (Webster's Internat. Dict. (3d ed.)) and there is ample authority the negotiations, discussions, reasoning, planning, and give and take which go beforehand in the making of a decision to commit oneself must all be deemed to be a part of the making of an agreement in the broad sense (*Stigall* v. *City of Taft*, 58 Cal.2d 565, 569 [25 Cal.Rptr. 441, 375 P.2d 289]). ■ Thus, the final execution of a contract, which is the time when the contract is technically made, is not the only time when a conflict of interest may be presented. If the date of final execution were the only time at which a conflict might occur, a city councilman could do all the work negotiating and effecting a final contract which would be available only to himself and then present the matter to the council, resigning his office immediately before the contract was executed. He would reap the benefits of his work without being on the council when the final act was completed. This is not the spirit nor the intent of the law which precludes an officer from involving himself in the making of a contract. The statutes are concerned with any interest, other than perhaps a remote or minimal interest, which would prevent the officials involved from exercising absolute loyalty and undivided allegiance to the best interests of the city (see *People* v. *Darby*, 114 Cal.App.2d 412, 426 [250 P.2d 743]).

■ The Board's conduct of extensive investigations and preparation of detailed proposals in aid of the city council's contract letting function are so closely related to that body's operation as to be viewed as involving the exercise of the council's own authority to some extent. This factor combines with the Board's advisory relationship to the city manager (who executes any contract after it is approved by the city council) to compel the conclusion the Board exercises administrative or

legislative authority in the letting of the contract as contemplated by section 94 of the charter.

■ We are satisfied the execution of a contract for layout and design of a Japanese garden in Balboa Park by WYI under the circumstances of this case would be in violation of section 94 of the Charter of the City of San Diego.

■ Government Code section 1090 in pertinent part reads as follows: "Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members. . . ."

For the reasons stated above it is clear the proposed contract would also violate the provisions of Government Code section 1090. The public policy supporting this position stems from the fact a public office is a public trust created in the interest and for the benefit of the people. Public officers are obligated to discharge their responsibilities with integrity and fidelity. The law of this state is that public officers shall not have a personal interest in any contract made in their official capacity. The charter provisions of the City of San Diego are in harmony with the established policy of this state in this regard and were created to remove all indirect as well as direct influence of an interested officer in the discharge of his duties. This is not intended to strike only at fraud or dishonesty and it is conceded none exists in the present case; the object of the enactment is to remove or limit the possibility of any personal influence either directly or indirectly which might bear on an official's decision as well as to void contracts which are actually obtained through fraud or dishonest conduct (*Stigall* v. *City of Taft, supra,* 58 Cal.2d 565, 569; *Terry* v. *Bender,* 143 Cal.App.2d 198, 206 [300 P.2d 119]). ■ Statutes prohibiting such "conflicts of interest" by a public officer are strictly enforced. These propositions are supported by a plethora of authority most notably Government Code sections 1090-1092 (*Terry* v. *Bender, supra,* 143 Cal.App.2d 198, 207).[1]

■ City council's reliance on *Escondido Lumber etc. Co.* v. *Baldwin,* 2 Cal.App. 606 [84 P. 284] is misplaced. That case involved a contract

---

[1]We have purposely avoided discussion of any possible violation of the provisions of the Moscone Governmental Conflict of Interests and Disclosure Act (Gov. Code, § 3600 et seq.) and the Political Reform Act of 1974 (Gov. Code, § 81000 et seq., particularly § 87100 et seq.) inasmuch as the city charter adequately covers the issue.

made by a school district with a builder for the construction of a $750 schoolhouse. Without indication of any previous agreement and after entering the contract with the school district, the contractor saw fit to purchase lumber from a corporation in which a school board trustee had a material interest. That was not a direct interest and the contract in no way involved the trustee. His benefit was fortuitously affected by the contractor's decision to buy supplies from the trustee's corporation. Here the contract is directly with the officeholder's firm, a firm contemplated as a recipient of the contract benefits before the contract was let.

The proposed contract violates San Diego City Charter section 94 as well as Government Code section 1090.

The judgment is affirmed.

Brown (Gerald), P. J., and Staniforth, J., concurred.

A petition for a rehearing was denied May 10, 1978, and appellant's petition for a hearing by the Supreme Court was denied June 15, 1978.