TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

_____

| | | |
|---|---|---|
| OPINION | : | |
| | : | No. 96-1103 |
| of | : | |
| | : | February 26, 1997 |
| DANIEL E. LUNGREN | : | |
| Attorney General | : | |
| | : | |
| CLAYTON P. ROCHE | : | |
| Deputy Attorney General | : | |
| | : | |

_____

THE HONORABLE SCOTT WILDMAN, MEMBER OF THE CALIFORNIA ASSEMBLY, has requested an opinion on the following question:

May two city firefighters who have developed a firefighting protective device sell the device to the city's fire department without violating the "self-dealing" contractual prohibition of Government Code section 1090?

CONCLUSION

Two city firefighters who have developed a firefighting protective device may sell the device to the city's fire department without violating the "self-dealing" contractual prohibition of Government Code section 1090 if they contract with the city solely in their private capacities.

ANALYSIS

Two firefighters in a charter city have developed a unique fire and heat resistant respiratory mask to be worn by firefighters while engaged in fighting a fire. The mask was developed entirely on the firefighters' own time and without the use of city materials. They have formed a private company to market the mask to fire departments throughout the United States.

The question presented for resolution is whether the firefighters may sell the masks to their own fire department. We are informed that the firefighters would have no input into the decision whether the city should make the purchase. Rather, the decision would be made by their superiors with the ultimate contract being made by either the city manager or the city council, depending upon the dollar value of the agreement. The fire chief would negotiate the price with the firefighters' company. The firefighters would not be involved as city employees in developing or executing the contract of sale. The issue presented is whether the contract would violate the terms of Government Code section 1090. We conclude that the statute would be inapplicable under the described circumstances.

Section 1090 of the Government Code **Footnote No. 1** provides in part:

"Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members. Nor shall state, county, district, judicial district, and city officers or employees be purchasers at any sale or vendors at any purchase made by them in their official capacity."

The first issue to be resolved concerns the "making" of a contract within the meaning of section 1090. For purposes of the statutory prohibition, the "making" of a contract has not been construed in its technical sense, but has included many of the "embodiments" that pertain to the entire contractual process. In 77 Ops.Cal.Atty.Gen. 112, 114-116 (1994), we quoted from an earlier opinion as follows:

"`The critical test for determining whether section 1090 has been violated is whether an officer or employee has participated in the making of a contract in his or her official capacity. (*Millbrae Assn. for Residential Survival* v. *City of Millbrae* (1968) 262 Cal.App.2d 222, 237; 66 Ops.Cal.Atty.Gen. at 160-161.) "[T]he statute not only strikes at situations that do involve actual fraud and dishonesty but also at those in which such is absent but in which the *possibility* exists nonetheless for *personal* influence of an interested [officer] to be brought to bear, either directly or indirectly, on an official decision. [Citations.]" (66 Ops.Cal.Atty.Gen. at 160, fn.3.)

"`In *People* v. *Sobel* (1974) 40 Cal.App.3d 1046, 1052, the court outlined the broad reach of section 1090:

"The decisional law, therefore, has not interpreted section 1090 in a hypertechnical manner but holds that an official (or a public employee) may be convicted of violation no matter whether he actually participated personally in the execution of the questioned contract, if it is established that he had the opportunity to, and did, influence execution directly or indirectly to promote his personal interests."

In *Millbrae Association for Residential Survival* v. *City of Millbrae*, *supra*, 262 Cal.App.2d at 237, the court defined the "making" of a contract to include the preliminary discussions, negotiations, compromises, reasoning, planning, drawing of plans and specifications, and solicitation for bids.

"`Section 1090's prohibition applies regardless of whether the contract is found to be fair and equitable (*Thomson* v. *Call* (1985) 38 Cal.3d 633, 646-649) or the official abstains from all participation in the decision to contract (*Fraser-Yamor Agency, Inc.* v. *County of Del Norte* (1977) 68 Cal.App.3d 201, 211-212). In *Thomson* a city mayor was found to have violated section 1090 despite his selective abstentions on votes concerning the acquisition of his property by the city, upon advice he received from his city attorney. The court refused to segment the "transaction" as urged by the mayor to preclude a violation of section 1090.

"`Section 1090 applies to persons in advisory positions to contracting agencies. (*City Council* v. *McKinley* (1978) 80 Cal.App.3d 204, 212-213; *Schaefer* v. *Bernstein* (1956) 140 Cal.App.2d 278, 291-292.)

"`In *Stigall* v. *City of Taft* (1962) 58 Cal.2d 565, 569-572, the court concluded that where a councilman had been involved in the preliminary stages of the planning and negotiating process but had resigned from the council prior to its vote on the contract, he nonetheless had been involved in the "making" of the contract. In *City Council* v. *McKinley, supra,* 80 Cal.App.3d at 212, the court followed this reasoning, stating:

". . . The negotiations, discussions, reasoning, planning, and give and take which go beforehand in the making of a decision to commit oneself must all be deemed to be a part of the

making of an agreement in the broad sense [citation]. . . . If the date of final execution were the only time at which a conflict might occur, a city councilman could do all the work negotiating and effecting a final contract which would be available only to himself and then present the matter to the council, resigning his office immediately before the contract was executed. He would reap the benefits of his work without being on the council when the final act was completed. This is not the spirit nor the intent of the law which precludes an officer from involving himself in the making of a contract."

"`In 66 Ops.Cal.Atty.Gen. 156, we concluded that county employees who proposed that their functions be accomplished through private consulting contracts were barred from contracting with the county to perform such services. We stated:

"We are told that the person involved, while employees of the county and *as employees of the county*, have provided input in the formulation of the contract. . . . By that participation in the give and take that went into such `embodiments' of the contract and drawing of plans and specifications, the county employees had the opportunity to, and did bring their influence to bear on the ultimate contract itself. While no fraud or dishonesty may have been involved, we are nonetheless satisfied that in so doing they participated, *not* in their personal capacities but in their official ones as *county employees* , in the `making of the contract' within the meaning of section 1090. . . ." (*Id*., at p. 160.)'"

Based upon the above authorities, it is clear that the two firefighters in question, through their private company, would be "making" a contract with the city for the sale of their protective masks.

This brings us to the second issue to be resolved. Would the firefighters be making the contract "in their official capacity" as specified in section 1090? Whether an officer or employee has participated in the making of a contract, including its "embodiments," in his or her official capacity was examined in *County of Marin* v. *Dufficy* (1956) 144 Cal.App.2d 30, where a county physician leased space in his medical building to the county. The court stated:

". . . In the instant case, it is clear that Dr. Dufficy and his wife executed the lease as private citizens who owned an office building in which the county desired to lease four rooms. They were in no sense acting in an `official capacity' . . . ." (*Id*., at p. 37.)

We have followed the reasoning of the court's decision in *Dufficy* in numerous opinions. (See, e.g., 63 Ops.Cal.Atty.Gen. 868 (1980) [real estate tax appraiser may purchase property within the county at a tax deeded sale]; 63 Ops.Cal.Atty.Gen. 19 (1980) [county officers and employees may bid on the sale of surplus county property]; 53 Ops.Cal.Atty.Gen. 163 (1970) [California Youth Authority board member may obtain surplus property from the Department of Resources].)

Of particular relevance to the issues presented herein is a 1973 letter opinion in which we determined that the Department of Corrections could enter into a contract with a company owned by one of its employees for the installation of an alarm system at several state prisons. The employee had developed the alarm devices entirely on his own time and without the use of any state property. We stated:

". . . As to Mr. Huber's dealings with San Quentin, Deuel Vocational Institute and the California Medical Facility, he was not involved in any of the planning, evaluation or procurement other than as a supplier of information about his product. All such procurement activity was in the hands of and carried out by the personnel of the facilities involved. At Soledad, while Mr. Huber was involved in the operation of the test, it was only in a technical capacity, i.e., to maintain and improve the equipment involved. His input into the procurement process was no more than that of a vendor displaying or showing his product under test

conditions. He was not connected with or involved in the evaluation and procurement of the system, which functions were accomplished by other Soledad personnel. Folsom had commenced testing and evaluation prior to Mr. Huber's transfer to that facility and concluded its procurement action after his arrival. This procedure was under the direction of Associate Warden Gunn, and Mr. Huber did not participate in the evaluation and procurement of the system.

"It is our opinion that the contracts for the sale of Mr. Huber's security alarm devices to various state prisons were not made by him in his official capacity as a state employee and said contracts are thus not proscribed by section 1090. . . ." (Cal. Atty. Gen., Indexed Letter, No. 73-146 (Aug. 29, 1973).) **Footnote No. 2**

Similarly, here, the two firefighters will be contracting with the city solely in their individual capacities and will not be involved *officially* with the making of the contract. They will have no input, as employees, into the city's decision whether to make the purchase. The decision will be made by the city council or city manager upon the recommendation of the fire chief. Under such circumstances, we conclude that they may sell their protective masks to the city without violating the "self-dealing" contractual prohibition of section 1090. **Footnote No. 3**

* * * * *

**Footnote # 1**
All unidentified section references hereafter are to the Government Code.
**Footnote # 2**
Public Contract Code section 10410 now prohibits contracts between state employees and state agencies.
**Footnote # 3**
It is conceivable that the "doctrine of necessity" might also apply in the described circumstances. This doctrine permits a public entity and a public officer to execute a contract that would otherwise violate the terms of section 1090. As explained in *Eldridge* v. *Sierra View Local Hospital Dist.* (1990) 224 Cal.App.3d 311, 321:

"The rule of necessity provides that a governmental agency may acquire essential goods or services despite a conflict of interest, and in nonprocurement situations it permits a public officer to carry out the essential duties of his/her office despite a conflict of interest where he/she is the only one who may legally act. The rule ensures that essential government functions are performed even where a conflict of interest exists. . . ."

In 76 Ops.Cal.Atty.Gen. 118, 121-122 (1993), we discussed the application of this doctrine in detail.