TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

_____

| | |
|---|---|
| OPINION : | |
| : | No. 97-511 |
| of : | |
| : | December 5, 1997 |
| DANIEL E. LUNGREN : | |
| Attorney General : | |
| : | |
| GREGORY L. GONOT : | |
| Deputy Attorney General : | |
| : | |

_____

THE HONORABLE NORMAN Y. HERRING, COUNTY COUNSEL, COUNTY OF GLENN, has requested an opinion on the following questions:

1.	May a director of an irrigation district contract with the district to obtain private construction services performed by the district valued at $29,000 in exchange for terminating a preexisting obligation of the district to repair a bridge located on the director's property, where such repair services are valued at $47,000?

2.	Alternatively, may the irrigation district pay the director $29,000 in consideration for terminating its preexisting and ongoing bridge maintenance obligation?

CONCLUSIONS

1.	A director of an irrigation district may not contract with the district to obtain private construction services performed by the district valued at $29,000 in exchange for terminating a preexisting obligation of the district to repair a bridge located on the director's property, even though such repair services are valued at $47,000.

2.	The irrigation district may not, in the alternative, pay the director $29,000 in consideration for terminating its preexisting and ongoing bridge maintenance obligation.

ANALYSIS

Under the provisions of the Irrigation District Law (Wat. Code, §§ 20500-29978), an irrigation district may, among other duties, "do any act necessary to furnish sufficient water in the district for any beneficial use" (Wat. Code, § 22075). We are informed that an irrigation district situated in two counties in Northern California has constructed bridges in connection with its irrigation and drainage facilities. The bridges were built in the 1920's when the district constructed large canals throughout the area. In exchange for the rights of way to construct the canals, the district agreed to build and maintain bridges over the canals, giving each owner access to his or her own property. One of these bridges presently requires repair work that

would cost the district $47,000 to perform. This particular bridge provides access only to lands currently owned by one of the five directors of the district. This director intends to construct additional private roads on his property estimated to cost $29,000. The district routinely contracts with its customers to provide private construction services, such as road construction, on a "first come, first serve" basis, depending upon the availability of personnel and equipment, at established hourly rates.

We are asked whether, under the described circumstances, the district may contract with the director to construct the private road at a cost of $29,000 in exchange for terminating its obligation to maintain the bridge on the director's property, currently requiring repair work costing $47,000. Alternatively, may the district pay the director $29,000 in exchange for terminating its bridge maintenance obligation? We conclude that under state law the district is prohibited from so contracting due to the director's financial interest in the proposed transactions.

As the contemplated arrangements concern the making of a contract by a public agency, the provisions of Government Code section 1090 **Footnote No. 1** require our analysis. (See 70 Ops.Cal.Atty.Gen. 42, 47 (1987).) Section 1090 states:

> "Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members. Nor shall state, county, district, judicial district, and city officers or employees be purchasers at any sale or vendors at any purchase made by them in their official capacity.

> "As used in this article, `district' means any agency of the state formed pursuant to general law or special act, for the local performance of governmental or proprietary functions within limited boundaries."

The Supreme Court has declared that the purpose of section 1090's prohibition "is to remove or limit the *possibility* of any personal influence, either directly or indirectly, which might bear on an official's decision, as well as to void contracts which are actually obtained through fraud or dishonest conduct. . . ." (*Stigall* v. *City of Taft* (1962) 58 Cal.2d 565, 569.) The statutory goal is "not only to strike at actual impropriety, but also to strike at the appearance of impropriety." (*City of Imperial Beach* v. *Bailey* (1980) 103 Cal.App.3d 191, 197.) Section 1090's prohibition applies regardless of whether the contract is found to be fair and equitable (*Thomson* v. *Call* (1985) 38 Cal.3d 633, 646-649) or whether the official would abstain from all participation in the decision-making process (*Fraser-Yamor Agency, Inc.* v. *County of Del Norte* (1977) 68 Cal.App.3d 201, 211-212).

However, exceptions to the prohibition have been made for certain "remote interests" (§ 1091) and "non-interests" (§ 1091.5). (See *Citizen Advocates, Inc.* v. *Board of Supervisors* (1983) 146 Cal.App.3d 171, 178-179; *Fraser-Yamor Agency, Inc.* v. *Del Norte County*, *supra*, 68 Cal.App.3d at 217-218; 67 Ops.Cal.Atty.Gen. 369, 375 (1984).) In addition, a "rule of necessity" has been applied in certain circumstances to permit the making of a contract that would otherwise be proscribed. (See 73 Ops.Cal.Atty.Gen. 191, 195 (1990); 69 Ops.Cal.Atty.Gen. 102, 107-112 (1986); 65 Ops.Cal.Atty.Gen. 305, 308-311 (1982).)

Here, it is proposed that the irrigation district would enter into a contract with one of its directors who would have a direct financial interest in the transaction. He would be one of the contracting parties and would be receiving either services or money from the district in exchange for taking over the district's obligation to repair and maintain the bridge in question. As stated in *Thomson* v. *Call*, *supra*, 38 Cal.3d at 645: "The proscribed interest certainly includes any *direct* interest, such as that involved when an officer enters directly into a contract with the body of which he is a member." We need only determine, therefore, whether either of the proposed transactions would qualify under one of the exceptions to section

1090's prohibition.

1.        Providing Construction Services

The first question to be resolved is whether the district may furnish private construction services in exchange for terminating its obligation to maintain the bridge located on the director's property. We conclude that it may not.

Looking at the exceptions set forth in sections 1091 (remote interests) and 1091.5 (noninterests), we find that section 1091.5, subdivision (a)(3), alone appears to afford any possibility of finding the proposed exchange transaction to be permissible. Section 1091.5 provides as follows:

"(a) An officer or employee shall not be deemed to be interested in a contract if his or her interest is any of the following:

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(3) That of a recipient of public services generally provided by the public body or board of which he or she is a member, on the same terms and conditions as if he or she were not a member of the board.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ."

The apparent intent of this provision is to exempt a board member's receipt of public services that are given under "the same terms and conditions" to the other customers of the public agency.

Here, it may be argued that the "public services" of the district not only include supplying water, but also furnishing private construction services to its customers on a "first come, first serve" basis at established hourly rates. Although the construction services are not performed pursuant to a statutory mandate but only pursuant to a contract, they are offered to all of the district's customers without exception when personnel and equipment are available. The "same terms and conditions" would be the established hourly rates set by the district.

However, even assuming subdivision (a)(3) of section 1091.5 is applicable to the district's hourly rates established for private construction services, the proposal in question involves the termination of a preexisting obligation to maintain a bridge on the director's property. The maintenance termination element of the transaction does not meet the "same terms and conditions" requirement of the statute. It would be a unique exchange applicable only to the director's property. Simply put, the proposed exchange of private construction services performed in exchange for terminating the district's maintenance obligation is not available to the other customers of the district *at all*.

The transaction under consideration is dissimilar to what the Legislature contemplated under section 1091.5, subdivision (a)(3)--the provision of services in accordance with previously adopted rate schedules applicable to all customers. Hence, the proposed transaction involving the termination of the district's bridge maintenance obligation does not escape the prohibition of section 1090 as a "noninterest" under the terms of section 1091.5.

We also reject the suggestion that the rule of necessity is applicable. In 65 Ops.Cal.Atty.Gen., *supra*, at 310, we described this doctrine as follows:

"With respect to contractual conflicts of interest the `rule of necessity' may be said to have two facets. The first, which is not involved herein, arises to permit a governmental agency to acquire an *essential* supply or service despite a conflict of interest. The contracting officer, or

a public board upon which he serves, would be the sole source of supply of such essential supply or service, and also would be the only official or board permitted by law to execute the contract. Public policy would authorize the contract despite this conflict of interest. (See 59 Ops.Cal.Atty.Gen. 604, 619 n. 18, and opinions cited therein.) The second facet of the doctrine, exemplified in *Caminetti* v. *Pac. Mutual Ins. Co.*, [(1943) 22 Cal.2d 344, 366-367], arises in nonprocurement situations and permits a public officer to carry out the essential duties of his office despite a conflict of interest where he is the only one who may legally act. It ensures that essential governmental functions are performed even where a conflict of interest exists."

The application of this rule has been analyzed in various contexts. (See, e.g., *Eldridge* v. *Sierra View Local Hospital Dist.* (1990) 224 Cal.App.3d 311, 321; 67 Ops.Cal.Atty.Gen., *supra*, at 378; 59 Ops.Cal.Atty.Gen. 604, 619 (1976); 57 Ops.Cal.Atty.Gen. 458, 463-465 (1974).)

Here, the proposed trade of bridge maintenance services for road construction services cannot be described as coming under either facet of the rule of necessity. Even if the district would in fact save $18,000 by providing the construction services in exchange for terminating its maintenance obligation, there is no essential supply, service, or governmental function involved. The expected savings from the transaction do not provide a basis for application of the rule.

Finally, we note that the proposed savings of $18,000, or even more, raises questions of valuation that the enactment of section 1090 was intended to avoid. Who will provide the estimated cost savings for the district the next time a director proposes a similar exchange? How will the customers of the district be assured that a cost estimate is accurate and not based upon any favoritism toward a particular director? In *Thomas* v. *Call*, *supra*, 38 Cal.3d 633, these types of questions were addressed by the Supreme Court with respect to the sale of property to a city by a city council member:

". . . In *San Diego* v. *S. D. & L. A. R. R. Co.*, *supra*, 44 Cal. 106, we recognized the conflict-of-interest statutes' origins in the general principle that `no man can faithfully serve two masters whose interests are or may be in conflict': `The law, therefore, will not permit one who acts in a fiduciary capacity to deal with himself in his individual capacity. . . . For even if the honesty of the agency is unquestioned . . . yet the principal has in fact bargained for the exercise of all the skill, ability and industry of the agent, and he is entitled to demand the exertion of all this in his own favor.' (44 Cal. at p. 113.) We reiterated this rationale more recently in *Stigall* v. *City of Taft*, *supra*, 58 Cal.2d 565: `The instant statutes [§ 1090 et seq.] are concerned with *any* interest, other than perhaps a remote or minimal interest, which would prevent the officials from exercising absolute loyalty and undivided allegiance to the best interests of the city.' (58 Cal.2d at p. 569. See, also, *City of Imperial Beach* v. *Bailey* (1980) 103 Cal.App.3d 191, 196; *City Council* v. *McKinley* (1978) 80 Cal.App.3d 204, 212; *People* v. *Darby* (1952) 114 Cal.App.2d 412, 426; *Miller*, *supra*, 28 Cal.App.2d at p. 366; *Hobbs, Wall & Co.*, *supra*, 109 Cal.App. at p. 319.)

"In *Stigall* we relied in part on the reasoning of the United States Supreme Court on a federal penal statute under which a contract was declared to be unenforceable because of a conflict of interest: `"The statute is thus directed not only at dishonor, but also at conduct that tempts dishonor. This broad proscription embodies a recognition of the fact that an impairment of impartial judgment can occur in even the most well-meaning men when their personal economic interests are affected by the business they transact on behalf of the Government. To this extent, therefore, the statute is more concerned with what might have happened in a given situation than with what actually happened. It attempts to prevent honest government agents from succumbing to temptation by making it illegal for them to enter into relationships which are fraught with temptation."' (*Stigall*, *supra*, 58 Cal.2d at p. 570, quoting *United States* v. *Mississippi Valley Generating Co.* (1961) 364 U.S. 520 [5 L.Ed.2d 268, 81 S.Ct. 294].) Implicit

in this reasoning is the assumption that the purpose of such statutes is `not only to strike at actual impropriety, but also to strike at the appearance of impropriety.' (*City of Imperial Beach*, *supra*, 103 Cal.App.3d at p. 197 [construing § 1090].)

"It follows from the goals of eliminating temptation, avoiding the appearance of impropriety, and assuring the city of the officer's undivided and uncompromised allegiance that the violation of section 1090 cannot turn on the question of whether actual fraud or dishonesty was involved. Nor is an actual *loss* to the city or public agency necessary for a section 1090 violation. In *Stigall*, for example, a city councilman had a financial interest in a plumbing company which submitted the *lowest* bids for a municipal contract. Taxpayers sued to have the contracts declared void. They did not allege `actual improprieties,' nor did they contend that the contract was unfair, unjust, or not beneficial to the city. (58 Cal.2d at p. 568.) On these facts, we nonetheless concluded that the contract violated section 1090, reasoning that the `object of these enactments is to remove or limit the *possibility* of any personal influence, either directly or indirectly which might bear on an official's decision, as well as to void contracts which are actually obtained through fraud or dishonest conduct.' (*Id*. at p. 569. See, also, *San Diego* v. *S. D. & L. A. R. R. Co.*, *supra*, 44 Cal. at p. 13; *City of Imperial Beach*, *supra*, 103 Cal.App.3d at p. 197; *Fraser-Yamor Agency, Inc.*, *supra*, 68 Cal.App.3d at p. 215; *Schaeffer* v. *Berinstein* (1956) 140 Cal.App.2d 278, 290.) And in *Shuffleton*, *supra*, we observed that `it matters not how fair upon the face of it the contract may be, the law will not suffer [the official] to occupy a position so equivocal and so fraught with temptation.' (203 Cal. at p. 105.)

"In short, if the interest of a public officer is shown, the contract cannot be sustained by showing that it is fair, just and equitable as to the public entity. Nor does the fact that the forbidden contract would be more advantageous to the public entity than others might be have any bearing upon the question of its validity. (*Capron* v. *Hitchcock* (1893) 98 Cal. 427.)" (*Id*., at pp. 647-649; fns. omitted.)

Here, regardless of the possible benefit to the district, section 1090 prohibits the proposed transaction because "the statute is more concerned with what might have happened in a given situation than with what actually happened." (*Id*., at p. 648.)

In answer to the first question, therefore, we conclude that a director of an irrigation district may not contract with the district to obtain private construction services valued at $29,000 in exchange for terminating a preexisting obligation of the district to repair a bridge located on the director's property, even if the bridge repair services will cost the district $47,000.

2.      Providing A Cash Payment

We are additionally asked whether the district may enter into a contract with the director if, instead of construction services, the district offers a cash payment of $29,000 in exchange for terminating its preexisting and ongoing bridge maintenance obligation. We conclude that the district may not so contract.

Although this latter proposal would make for a less complicated transaction and place a finite limit upon the expenditure of district resources, we do not view this modification as allowing the noninterest exception of section 1091.5 to become applicable. Similarly, we do not view the receipt of cash, as opposed to construction services, as having any effect on whether the rule of necessity may be invoked. There is simply no essential supply or service being acquired by the district.

In short, regardless of the "bargain" given to the district in relieving it of its maintenance responsibility, the circumstances of the proposed payment would be conducive to the appearance of impropriety; the transaction cannot be justified on the basis that the district might benefit financially.

Accordingly, we conclude in answer to the second question that the district may not pay the director $29,000 in consideration for terminating its preexisting and ongoing bridge maintenance obligation even though the bridge in question currently requires repair work that will cost the district $47,000.

\* \* \* \* \*

---

**Footnote No. 1**
All section references hereafter are to the Government Code.