Filed 8/26/16  Orange County Communities Organized for Responsible Development v. City of Anaheim CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| ORANGE COUNTY COMMUNITIES ORGANIZED FOR RESPONSIBLE DEVELOPMENT, | G052274 |
| Plaintiff and Appellant, | (Super. Ct. No. 30-2014-0072186) |
| v. | O P I N I O N |
| CITY OF ANAHEIM et al., | |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, David T. McEachen, Judge.  Affirmed.

Briggs Law Corporation, Cory J. Briggs and Anthony N. Kim for Plaintiff and Appellant.

Duane Morris, Colin L. Pearce and Heather U. Guerena; Michael R.W. Houston, City Attorney and Kristin A. Pelletier, Assistant City Attorney, for Defendant

and Respondents City of Anaheim, Kris Murray, Lucille Kring, Gail Eastman and Jordan Brandman.

Rutan & Tucker, Robert S. Bower, John A. Ramirez and Peter J. Howell for Defendant and Respondent GardenWalk Hotel I, LLC.

\*      \*      \*

OCCORD (Orange County Communities Organized for Responsible Development), a community activist group, has sued the City of Anaheim (the city), four of its councilmembers (defendants Kris Murray, Lucille Kring, Gail Eastman, and Jordan Brandman), and a hotel developer (GardenWalk) to invalidate two contracts, called "economic assistance agreements" or "EAAs," entered into by the city with GardenWalk in May 2013.  The two EAAs contemplate GardenWalk will build two hotels in Anaheim's resort district:  a "resort hotel" and a "convention hotel."  In return, the city has promised to remit to the developer 70 percent of the bed taxes the city will collect from the hotels up to a certain amount.  Those amounts are about $76 million for the resort hotel, and $81 million for the convention hotel.

OCCORD calls the deal a "tax subsidy."  But the city hopes the presence of the two hotels will produce an overall net increase in tax revenue from the increased job growth and tourism precipitated by the presence of first-class hotels in its resort district.  While OCCORD tells us it has no quarrel with the basic theory behind the EAA agreements, it believes the agreements should be set aside because they were made in violation of the state conflict of interest statute, section 1090 of the Government Code.[1]

---

[1] All further statutory references are to the Government Code unless otherwise indicated.  The statute provides in its entirety:

"(a) Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by anybody or board of which they are members.  Nor shall state, county, district, judicial district, and city officers or employees be purchasers at any sale or vendors at any purchase made by them in their official capacity.

"(b) An individual shall not aid or abet a Member of the Legislature or a state, county, district, judicial district, or city officer or employee in violating subdivision (a).

"(c) As used in this article, 'district' means any agency of the state formed pursuant to general law or special act, for the local performance of governmental or proprietary functions within limited boundaries."

2

On that point OCCORD has two theories: The first is that the four city council member defendants received "excessive" campaign contributions from the developer. According to the complaint, that was the result of individuals who have affiliations with GardenWalk donating to their *individual* limits, with a total that exceeds legal limits. These excessive contributions, alleges OCCORD, were given as "quid pro quo" (the exact words in the complaint) to approve the EAAs. Other than using the words "quid pro quo," however, the second amended complaint contains no elaboration as to the alleged exchange. For example, there is no allegation that a councilmember solicited contributions from GardenWalk to vote for the EAAs, or that a GardenWalk-affiliated contributor approached a council member offering to contribute in exchange for a favorable vote on the EAAs, or even that there was anything like a wink-wink-nudge-nudge implied understanding to vote in the contributor's interest. No such allegations are made.

The second theory, according to OCCORD, is that the EAAs were negotiated on the developer's behalf by a law firm, Rutan and Tucker, who at the same time served as the city's own attorney. Thus the agreements are also the product of the *law firm* contravening section 1090.

On demurrer to OCCORD's second amended complaint, the trial court ruled the suit was barred by the shortened (60-day) statute of limitations provided by what are known as the "validation" statutes (see Code Civ. Proc., §§ 860-870). The court also ruled the complaint had failed to state a valid conflict-of-interest claim under section 1090, and further held the mere fact Rutan and Tucker were paid for their services did not violate section 1090 either. OCCORD has timely appealed from the judgment entered after demurrer was sustained without leave to amend.

Preliminarily we reject the defendants' statute of limitations argument as unviable. Statutorily, the specific controls the general (e.g., *Hughes Electronics Corp. v. Citibank Delaware* (2004) 120 Cal.App.4th 251, 270 [specific statutory provisions

3

bearing on a particular subject control over more general ones]) and section 1090 has its own specific statute of limitations in section 1092, which is considerably more lenient (four years after discovery) than the 60 days set out in the validation statutes. This suit is easily within that time frame – filed in May 2014, which is just a little more than a year after the signing of the EAAs in March 2013.

The same applies to their argument OCCORD lacks standing to bring a taxpayer challenge to the EAAs. Taxpayers have standing to challenge government actions in alleged contravention of section 1090. (See *Thomson v. Call* (1985) 38 Cal.3d 633 [taxpayers had standing to challenge double escrow by which firm purchased land from city council member and then sold it to city]; *McGee v. Balfour Beatty Construction, LLC* (2016) 247 Cal.App.4th 235, 248 [following *Thomson* in finding taxpayer standing under section 1090].)

That brings us to the merits of OCCORD's challenge. Anaheim has a set of campaign finance ordinances, called the campaign reform law or "CRL." The current (inflation adjusted) limit for individual donations subject to the CRL is $1,900. While GardenWalk made no contributions to city council members directly, OCCORD's second amended complaint identifies 14 contributors to the four city council member defendants it says are "affiliated" with GardenWalk. This pool consists of five individuals,[2] four businesses,[3] a political action committee (PAC) and three of its board members,[4] and finally, an anonymous "general manager" of one of the businesses.[5] The second amended complaint totes up the aggregate total of the contributions from those 14 for

---

[2] Bill O'Connell, Jean O'Connell, Ajesh Patel, John Ramirez and Mike Rubin.

[3] Stovall's Inn, Anaheim Park Place Inn, Orangewood LLC and Paul Kott Realtors.

[4] The PAC is SOAR, standing for (according to the complaint) "Support Our Anaheim Resorts." The three board members are Sandra Day, Craig Farrow, and Larry Slagle.

[5] Who is only called the "general manager of Stovall's Inn" in the complaint.

4

each city councilmember and ascribes that total to GardenWalk in order to arrive at amounts in excess of $1,900.[6]

But Anaheim's CRL sets out its aggregation rules in section 1.09.070. Two or more entities are treated as one person for aggregation purposes only when the entities fall within one of five categories. They are one person when they: (1) share the majority of members of their boards of directors (1.09.070.0201), (2) are controlled by the same majority shareholders (1.09.070.0202), or are (3) in a parent-subsidiary relationship (1.09.070.0203). Additionally, (4) an individual and any partnership which he or she manages or owns a controlling interest is treated as one person (1.09.070.030), as are (5) campaign committees where the majority of officers of those committees are the same (1.09070.040). As it turns out, none of the 14 contributors listed in the complaint gave more than $1,900 to any one of the four individual city council defendants, with the exception of one business, whose $300 contribution in excess of $1,900 to member Eastman was returned by her in February 2014. The general manager of that business also made a contribution of $1,900 to member Murray, but that contribution was also returned in February 2014.

The complaint's theory of excessive contributions is based on each contributor's putative allegiance to developer GardenWalk. It alleges that three of the individuals (Bill O'Connell, Jean O'Connell and Ajesh Patel) were "members and managers" of GardenWalk. Likewise it asserts that Jean O'Connell controls the SOAR PAC.

These putative allegiances, however, do not establish single-personhood under the plain terms of the city's CRL. After two previous efforts, OCCORD's second amended complaint lacks allegations that would result in aggregation of the various

---

[6] For example, for councilmember Murray, the complaint alleges she received $1,600 from Bill O'Connell, $1,900 from Jean O'Connell, $1,900 from Ajesh Patel, $300 from Stovall's Inn, $1,900 from the general manager of Stovall's Inn, and $1,900 from the SOAR PAC to arrive at a grand total of $9,500 from GardenWalk "affiliated" contributors.

contributors. The CRL has no rule of looking to some amorphous affiliation between contributors for aggregation. Rather it lays down a series of bright lines, and OCCORD fails to show the various members of the contributor pool fall on the one-person side of those bright lines.[7]

The upshot is that OCCORD's *excess* contribution theory as stated in its second amended complaint is without the *excess* element.[8] That's important. It has been established that *legal* campaign contributions do not implicate the conflict of interest prohibition of section 1090. (See *BreakZone Billiards v. City of Torrance* (2000) 81 Cal.App.4th 1205, 1230 (*BreakZone*)[9]; *All Towing Services LLC v. City of Orange* (2013) 220 Cal.App.4th 946, 957 [noting state Political Reform Act of 1974 (PRA) categorically excludes receipt of campaign contributions from definition of financial interest]; see also *Woodland Hills, supra*, 26 Cal.3d at p. 947, fn. 9 [noting mischief that might be done if campaign contributions did disqualify recipient from voting on matter related to donor].)[10] As our Supreme Court very recently opined, councilmembers are not barred "from acting on matters involving contributors" – indeed, "campaign contributions are

[7]  While the CRL's categories may be counterintuitive, they are nonetheless clear. Perhaps the most obvious case in point is Bill O'Connell and his wife Jean. The CRL is quite clear that contributions by one spouse are *not* aggregated with the other spouse's contributions. (§ 1.09.070.050.) That may or may not be the way we would have written the rule, but that is the rule.

[8]  The sharp-eyed trial judge recognized that an unreported meal "long after the vote at issue," as described in a newspaper article and email mentioned in the opposition to the demurrer were not in the second amended complaint. We need merely note here that after two previous chances to cure any deficiencies in its pleading, the trial judge was within his discretion in impliedly denying any further chances to amend.

[9]  The relevant passage concerning section 1090 is quite clear: "Government Code section 1090 codified the common law prohibition of public officials having a financial interest in contracts they make in their official capacities. [Citations.] The purpose of this section is to prohibit self-dealing, not representation of the interests of others. It is the latter circumstance that confronts BreakZone. BreakZone contends that the recipients of political contributions voted the interest of the developer who had a history of contributing to their political campaigns. *That allegation, whether true or not, is not forbidden by either Government Code section 1090 or section 87103.*" (*BreakZone, supra*, 81 Cal.App.4th at p. 1230, citing *Woodland Hills Residents Assn., Inc. v. City Council* (1980) 26 Cal.3d 938, 946-947 (*Woodland Hills*), italics added.)

[10]  That's to be contrasted with the several ways in which a waste-management entrepreneur in *Hub City Solid Waste Services, Inc. v. City of Compton* (2010) 186 Cal.App.4th 1114 (*Hub City*) showered benefits on the Compton City Council in return for a franchise on the city's waste-management services. Those included jobs for councilmembers' relatives (*id*. at pp. 1118) and monetary gifts to other relatives (*id*. at pp. 1120-1121). The *Hub City* court did not discuss the question of whether the campaign contributions given by the entrepreneur were legal or not; it had no need to.

6

constitutionally protected and 'do not automatically create an appearance of unfairness.'" (*City of Montebello v. Vasquez* (Aug. 8, 2015, S219052) ___ Cal.4th ___, ___ [2016 Cal. LEXIS 6386 at p. 25], quoting *Woodland Hills*, *supra*, 26 Cal.3d at p. 947.) The second amended complaint (at paragraphs 12.A.i. and 12.A.x.) makes it clear that its claims of illegality rest upon the alleged *excessiveness* of the GardenWalk-affiliated persons' contributions.[11] That effort fails.

OCCORD'S other theory involves a law firm, Rutan and Tucker (Rutan). Back in 2012 and 2013, Rutan represented Anaheim in OCCORD's earlier – and then successful – attempt to thwart the city's attempt to enter into EAAs with GardenWalk, *OCCORD v. City of Anaheim*, case No. 30-2012-00549175 (the "175 case"). That attempt was successful based on a Brown Act violation. In the case now before us, OCCORD alleges that Rutan acted as *GardenWalk's* counsel in negotiating the EAAs with Anaheim. Fairness requires we note here that on appeal Rutan strenuously denies the allegation of representing GardenWalk. Rutan points out that the EAAs themselves indicate Gardenwalk was actually represented by another firm in the negotiations leading up to the March 2013 EAAs.[12] We must also note there is no allegation Rutan represented Anaheim in negotiating *those* EAAs.

Rutan's relationship with Anaheim has been that of an independent contractor. The city has had its own city attorney's office since at least as far back as 1992 (see *Guillory v. City of Anaheim* (9th Cir. 1992) 979 F.2d 854 at p. 1 [nonpub. opn.]), but Rutan has, from time to time, also represented the city in specific litigation, such as the 175 case.

That independent contractor status is not dispositive for section 1090. In *California Housing Finance Agency v. Hanover/California Management & Accounting*

<hr>

11 Indeed, by not including a reporter's transcript in the record, OCCORD has foregone the opportunity to show that it argued anything else to the trial court.

12 The EAAs themselves list the "The Busch Firm" as counsel for GardenWalk and the Anaheim City Attorney's office as counsel for the city.

*Center, Inc.* (2007) 148 Cal.App.4th 682 (*CHFA*), this court held that a former general counsel of a government agency *could* be liable under section 1090 where he had, as an independent contractor after leaving his official office, exercised "'considerable' influence" in obtaining a contract from that agency for his own company.

That said, what is lacking here, but present in the cases on which OCCORD relies, is an interest *in the government contract itself* that is sought to be invalidated under section 1090. In *Hub City, supra*, 186 Cal.App.4th 1114, a private person became a city's de facto waste disposal czar with a monopoly on the city's waste disposal services as a result of a contract he himself negotiated. In *CHFA*, *supra*, 148 Cal.App.4th 682, the former general counsel of a state agency set up a private company which he owned that allowed him to skim off profits from government mortgage insurance premiums. In *People v. Gnass* (2002) 101 Cal.App.4th 1271, an attorney earned fees on bonds issued by a public financing authority for which he acted as counsel. In *Campagna v. City of Sanger* (1996) 42 Cal.App.4th 533, a deputy city attorney tried to obtain a share of a contingency fee obtained on litigation he himself sent to an outside law firm, and in *City Council v. McKinley* (1978) 80 Cal.App.3d 204, 207, the president and stockholder in a landscape architectural firm was also on the city's park and recreation board which awarded a gardening contract for the firm.

Here, however, there are no allegations of any interest on Rutan's part in the EAAs. The worst that can be said about the firm is that it got paid. To that, OCCORD responds that it would not have been retained by GardenWalk *at all*, but for Rutan's representation of the city in the prior suit brought by OCCORD.[13]

But the motivation for GardenWalk's retention makes no difference. OCCORD confuses the benefits conferred by the contracts themselves (on GardenWalk

_____

[13]    The second amended complaint in effect admits that its allegation that Rutan represented GardenWalk in negotiating the EAAs with Anaheim is essentially speculative. At paragraph 12.B.ii of the second amended complaint, OCCORD states its belief that once it obtains discovery, it will find emails between Rutan, the city and GardenWalk concerning the EAAs which were the subject of the 175 case.

and arguably on Anaheim) with the payment Rutan allegedly received for negotiating them.  As the court said in *Quantification Settlement Agreement Cases* (2011) 201 Cal.App.4th 758, 819:  "'[t]he interest proscribed by . . . section 1090 is an interest *in* the contract.  The purpose of the prohibition is to prevent a situation where *a public official* would stand to gain or lose something with respect to the making of a contract over which in his official capacity he could exercise some influence.'"  (Italics added, quoting *People v. Vallerga* (1977) 67 Cal.App.3d 847, 867-868, fn. 5.)

There are no facts indicating Rutan exerted sufficient influence over Anaheim in its decision to enter into the EAAs such that Rutan, an independent contractor, could be deemed a public official within section 1090 the way the entrepreneur in *Hub City* or the former general counsel in *CHFA* were.  Indeed, the main point of the complaint was that a majority of the Anaheim city council itself was determined to enter into the EAAs because of campaign contributions from the pool of 14, and didn't need any influence from an outside law firm in that regard.

We cannot find here anything on which to base reversal of the trial court's demurrer ruling.  The judgment is therefore affirmed.  Respondents shall recover their costs on appeal.


BEDSWORTH, ACTING P. J.

WE CONCUR:


ARONSON, J.


IKOLA, J.


9