[EDITORS' NOTE: THIS OPINION IS DEPUBLISHED UPON GRANTING OF PETITION FOR REVIEW. THE OPINION APPEARS BELOW WITH A GRAY BACKGROUND.]
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1427 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1428 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1429 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1430 
OPINION
Petitioners Cathy Lexin, Ronald Lee Saathoff, John Anthony Torres, Mary Elizabeth Vattimo, Teresa Aja Webster and Sharon Kay Wilkinson (collectively, petitioners), all former members of the board of administration (board or retirement board) of the San Diego City Employees' Retirement System (SDCERS), were charged in May 2005 with three felony counts[1] of violating Government Code section 1090, [2]
a statute that prohibits public officials and employees from having a financial interest in contracts they make in their official capacities. The petitioners allegedly agreed to allow the City of San Diego (City) to underfund its pension system by voting to approve an agreement known as "City Manager's Proposal 2" (MP2) in exchange for the City agreeing to provide increased pension benefits to City employees, including petitioners. Lexin was the City's human resources director; Vattimo was the City treasurer, Webster was the City's assistant auditor and comptroller, Saathoff was a City fire captain, Torres worked for the City police department crime lab, and Wilkinson was a City management analyst.
 Following the preliminary hearing in this matter, the court found there was sufficient evidence for a trial to proceed against petitioners on one count under section 1090. Petitioners filed a Penal Code section 995
motion to set aside the information, alleging that Government Code section 1090 did not apply to their actions, and, even if it did, petitioners fell within an exception stated in Government Code section1091.5, subdivision (a)(9) (section 1091.5(a)(9)), which exempts "salary" from prohibited financial interests in *Page 1432 
contracts under section 1090. Petitioners asserted that pension benefits are included within the definition of "salary." The court denied the motion, finding that there was probable cause that petitioners violated section 1090 and that the exception stated in section 1091.5(a)(9) did not apply. The court found that if petitioners agreed to underfund the pension system, they were "furthering their personal financial interest in receiving the enhanced retirement benefits. . . . This personal financial interest conflicted with petitioners' responsibility as board members, when approving the trigger, to be concerned only with the protection of the financial viability of the retirement system." In finding that the exception in section 1091.5(a)(9) did not apply, the court reasoned that because the wording of that section was amended in 1999, changing the exception for contracts involving "compensation" to those involving "salary," the Legislature intended not to include pension benefits within the scope of exemptions included within section 1091.5(a)(9).
 Petitioners filed a petition for writ of prohibition with this court on August 23, 2006, seeking the issuance of a writ ordering the superior court to grant their motion to set aside the information. On September 25, 2006, we denied the petition. Petitioners filed a petition for review with the California Supreme Court, which the high court granted on November 29, 2006. The matter has been transferred to this court, with the Supreme Court ordering that we vacate our previous denial and direct the superior court to show good cause why the relief requested in the petition should not be granted. We now consider the petition on the merits.
 On this writ of prohibition, petitioners, without acknowledging that the facts alleged by the People are true, assert the court erred as a matter of law in denying their motion to set aside the information because their actions were not a violation of section 1090. Specifically, petitioners contend (1) they did not have a financial interest in a contract made by them; (2) under section 1091.5(a)(9) pension benefits are excluded from section 1090 financial interests in a contract; (3) under section 1091.5, subdivision (a)(3) (section 1091.5(a)(3)), the pension benefits were "public services" that are not prohibited financial interests under section 1090; (4) due to the composition of the board, they were required by law to consider the pension increase and the City's request regarding funding; and (5) this prosecution criminalizes the exercise of their fiduciary duties. Accordingly, petitioners request that we issue a writ directing the respondent superior court to grant their motion to set aside the information in this matter.
 We conclude that (1) drawing every legitimate inference in favor of the information, the People presented sufficient evidence at the preliminary hearing such that "a reasonable person could harbor a strong suspicion of [petitioners'] guilt" (Cooley v. Superior Court (2002)29 Cal.4th 228, 251 *Page 1433 
[127 Cal.Rptr.2d 177, 57 P.3d 654] (Cooley)) under section 1090 based upon their actions in considering, discussing, negotiating and ultimately voting to approve MP2 because the increase in pension benefits was, under the evidence presented, arguably conditioned on that approval; (2) pension benefits are within the definition of "salary" for purposes of the exception provided by section 1091.5(a)(9); (3) the exception provided by section 1091.5(a)(9), however, is not applicable because the increased pension benefits directly impacted petitioners' departments or employing units; (4) the exception provided by section 1091.5(a)(3) does not apply because the granting of pension benefits is not a "public service?"; (5) the composition of the pension board did not control petitioners' actions; and (6) prosecution under section 1090 does not criminalize petitioners' exercise of their fiduciary duties. Accordingly, we deny the petition.
 FACTUAL AND PROCEDURAL BACKGROUND A. Overview of Pension System and Board Responsibilities
 SDCERS is a public employee retirement system established by the City. (San Diego City Charter, art. IX, § 144 (City Charter).) SDCERS is a defined benefit plan in which benefits are based upon salary, length of service, and age. (City Charter, art. IX, § 141.)
 SDCERS is administered by its board, not the City or City council. (City Charter, art. IX, § 144.) Although established by the City, the board is a separate entity. (Ibid.) As stated by the California Constitution, article XVI, section 17, subdivision (b), board members serve as fiduciaries charged with acting solely in the best interests of participants and beneficiaries of the plan: "(a) The retirement board of a public pension or retirement system shall have the sole and exclusive fiduciary responsibility over the assets of the public pension or retirement system. The retirement board shall all so have sole and exclusive responsibility to administer the system in a manner that at will assure prompt delivery of benefits and related services to the participants and their beneficiaries. The assets of a public pension or retirement "system are trust funds and shall be held for the exclusive purposes of providing benefits to participants in the pension or retirement system and their beneficiaries and defraying reasonable expenses of administering the system, [¶] (b) The members of the retirement board of a public pension or retirement system shall discharge their duties with respect to the system solely in the interest of, and for the exclusive purposes of providing benefits to, participants and their beneficiaries, minimizing employer contributions thereto, and defraying reasonable expenses of administering the system. A retirement board's duty to its participants and their beneficiaries shall take precedence over any other duty." *Page 1434 
 By contrast, the granting of retirement benefits is exclusively a power of the City council. (City Charter, art. IX, § 141.) Also, the City is charged with making employer contributions to the pension system to fund employee retirement benefits. (City Charter, art. IX, § 143; San Diego Mun. Code, former § 24.0801.) In this regard, it has been recognized that members of a public retirement system have a constitutional right to an actuarially sound pension fund. (See Board ofAdministration v. Wilson (1997) 52 Cal.App.4th 1109 [61 Cal.Rptr.2d 207] (Wilson) [holding that "in arrears" pension financing unconstitutionally impaired the contractual right to an actuarially sound retirement system and failed to provide comparable new advantages for its adverse effect];Valdes v. Cory (1983) 139 Cal.App.3d 773 [189 Cal.Rptr. 212] [holding that legislation requiring the suspension of employer contributions to the public employees' retirement system fund for three months, in order to balance the state budget, constituted an unconstitutional impairment of contractual relationships between members and their public employers].)
 B. The Petitioners
 During the time relevant to this petition, petitioners were all board members of SDCERS. They were also City employees.
 In 2002, article IX, section 144 of the City Charter required that the composition of the board of SDCERS consist of 13 members with three specifically designated ex officio positions for the City manager, the City treasurer and the City auditor and comptroller; one position designated to represent fire safety members; one for police safety members; one position to represent retired City employees; and three positions to be elected from the SDCERS active membership. The other four board members were drawn from the community and appointed by the City council. Lexin, Vattimo and Webster were the ex officio designees, Saathoff represented fire safety members, and Wilkinson and Torres were elected from the general membership.
 C. 1996 Contribution Agreement (MP1)
 From 1996 to 2002 the City contributed to the SDCERS pension fund under an agreement with SDCERS known as the "City Manager's Proposal 1" (MP1). The agreement provided that the City would contribute at a set budgeted rate, less than an actuarially determined rate, pursuant to an agreed-upon schedule.[3] The schedule required the City's contribution rate to *Page 1435 
increase by 0.5 percent per year (as a percentage of payroll) until the City's annual contribution rate equaled the actuarial rate. At the time MP1 was created, the retirement system was 92.3 percent funded. As part of MP1, there was a safety valve provision, known as the "trigger," that called for a balloon payment if the funded ratio of the system dropped below 82.3 percent.
 At the time the SDCERS board was considering approving the 1996 MP1, the City informed it that if the board did not do so, it would not implement retirement benefit increases recently negotiated with the City's labor unions. The board's fiduciary counsel opined that it was not a breach of the board's fiduciary duty to members of the pension system to agree to lessen the City's contribution to the pension fund if the City's contribution modification bears "`some material relation to the theory of a pension sysiem and its successful operation,' and if the modifications (which result in disadvantage to employees), are accompanied by comparable new advantages to the members. . . . `The saving of public employer money is not an illicit purpose if changes in the pension program are accompanied by comparable new advantages to the employee.'" (Quoting Claypool v. Wilson (1992) 4 Cal.App.4th 646, 665
[6 Cal.Rptr.2d 77].) Although not the basis for the criminal allegations in this action, the People allege that this was the first time the retirement board voted to relax the City's contribution obligations in exchange for increased pension benefits.
 D. Negotiations Regarding Increased Pension Benefits
 Beginning in February 2002[4] the City began "meet and confer" negotiations with municipal unions, the San Diego Police Officer's Association (POA), the San Diego City Firefighters IAFF Local 145 (Firefighters), the San Diego Municipal Employees Association (MEA), and the American Federation of State, County and Municipal Employees Local 127 (Local 127) regarding possible pension benefits increases.
 In preparation for the negotiations, the City assembled a negotiating team. SDCERS boardmember Lexin, the City's director of human resources, was the lead negotiator. Lamont Ewell, the assistant city manager, and Michael Uberuaga, the city manager, were both on that team as well. Other team members were Senior Deputy City Manager George Loveland, Deputy City Manager Bruce Herring, Labor Relations Manager Dan Kelley, Personnel Director Rich Snapper, and representatives from the Office of the San Diego City Attorney. Deputy City Attorney Elmer Heap was regularly involved in the negotiating process.
 One of the motivations driving the unions' request for increased retirement benefits was the fact that the County of San Diego (County) had agreed in *Page 1436 
February to retirement multipliers for County employees of 2 percent at age 50, 2.5 percent at age 55 and 3 percent at age 60. The MEA requested a similar increase in the retirement benefit formula to 2.5 percent at age 55. Ewell believed that this request was "consistent with the marketplace" and was "competitive." It was important to the City to remain "competitive" in order to "keep the best and brightest."
 However, in 2001, SDCERS earnings had begun falling significantly. By October 31, 2001, the fund had earned only $14.1 million dollars, a decrease of 87 percent from the previous year. A draft actuarial report completed in February by SDCERS actuary Rick Roeder showed the funded ratio had dropped from 97 percent to 90 percent in one year. There was a concern that the 82.3 percent trigger would be met, which would have required an additional contribution to the pension fund from the City of approximately $25 million within one year.
 The City's negotiating team at that time began exploring conditioning an increase in pension benefits on obtaining relief from SDCERS from the 82.3 percent trigger. On March 18 petitioner Webster, the City's assistant auditor and comptroller, responded to an e-mail inquiry from fellow SDCERS board member Ray Garnica regarding solutions to the 2002 earnings problems for the SDCERS fund: "I think your questions centered around why does the City care about the solution to the FY 02 earnings problem? Answer: for many reason[s] . . . the four biggest ones are: [¶] 1. Funding ratio: Fiscal time bomb is attached to this. If it drops below 82.3% the City has to pay approx[.] $26m a year. [¶] . . . [¶] 4. Meet-and-confer: is going on now . . . answers are needed from retirement now as compensation offers are being exchanged and the Mayor, [City] Council and City Manager need to know what the current and projected [SDCERS] status is as they consider possible retirement enhancements. [¶] . . ." (Boldface omitted).
 As Heap explained, during this time he "was absolutely consumed in trying to accomplish getting an agreement with the retirement board that we could give the City a little bit more time from a financial standpoint." The City's negotiating team discussed in strategy meetings that "there was a real probability that we were going to hit the trigger and drop below the 82.3 [percent]." According to Ewell, if the trigger were hit, there was "going to be about a $25 million impact to the City" that would have had a very negative impact on its ability to deliver services and that would have led to layoffs.
 According to Ewell, they "were discussing benefit enhancements that would allow [the City] to be more competitive, but it was dependent upon whether or not [the City] could get some relief from the retirement board." In fact, Ewell never heard anybody from the City talk about enhanced retirement *Page 1437 
benefits being decoupled from contribution relief. It was always his understanding that enhanced retirement benefits were contingent upon such relief from the SDCERS board.
 1. City's negotiations with MEA
 Ann Smith, union attorney for the MEA, was the lead negotiator for the MEA in attempting to reach a collective bargaining agreement with the City. She was attempting through the negotiations to achieve parity for MEA members with County employees who had received a set of increases to their pension benefits. The City gave the MEA a written counterproposal that would give a 2.5 percent multiplier at age 55, but that was "contingent on getting appropriate relief from the Retirement Board with regard to the trigger."
 Petitioner Torres was vice-president of the MEA and a SDCERS board member. He was not a member of the MEA's negotiating team and did not vote on any issue related to that process. His role was as an adviser to the negotiating team. When the City introduced the funding contingency into the negotiation process, he recused himself from any of the discussions.
 In May the MEA accepted the City's offer, which included the increase to a 2.5 percent formula, but was contingent on the City obtaining trigger rate relief of 75 percent. The MEA members ratified the agreement between June 25 and June 28.
 2. Negotiations with Firefighters
 Petitioner Saathoff, the Firefighters' president and SDCERS board member, was the Firefighters' lead negotiator with the City on the collective bargaining agreement. He also was employed by the City as a fire captain.
 According to Heap, in the City's negotiations with the Firefighters it was made clear that "benefits were conditioned upon approval of the retirement board." Michael McGhee, a labor relations officer for the City, was the principal staff person for the City during the meet-and-confer process with the unions. He and Lexin were the principal negotiators for the City with the Firefighters and the POA. The subject of increased retirement benefits being contingent on action by the SDCERS board came up several times at meetings where Saathoff was present. It was McGhee's understanding that if the board did not grant contribution rate relief, the new retirement benefits would not have been granted. *Page 1438 
 3. Saathoff's personal benefit increase
 Union presidents received a salary from the City and were also paid by the unions to act as their presidents. Beginning in approximately 1989, the POA president began contributing to his pension based on the president's salary being paid him by the union, in addition to his salary as a police officer. In 1997 the president of MEA secured the same right.
 In 2002 the Firefighters sought the same treatment. Concerned about potentially higher payments for presidents, the City considered "unwinding" the existing programs. However, the City attorney advised that the unions would sue and prevail based upon the presidents' detrimental reliance on years of informal agreements. Ultimately, the City council, acting on the advice of the City attorney, decided to provide equivalent rights to each of the union presidents (POA, MEA and Firefighters), but only as to those presently holding that title. In October the City counsel adopted a resolution that memorialized the enhanced benefits for union presidents. The City agreed to "base the retirement benefit formula for those incumbent union presidents on their respective high one-year salary from their combined City and union salary. . . ." Further, the incumbent union presidents agreed "to pay, in addition to their payment to [SDCERS] of their employee's biweekly contribution for their City salary, the employer's and employee's biweekly contribution to [SDCERS] for their union salary." Pension contributions for future union presidents would be based solely on their City salaries. The City council also imposed a limit on the amount of salary that could qualify for the incumbent union presidents.
 In May Saathoff briefed union members about the status of the meet-and-confer negotiations with the City. Toward the end of the meeting he discussed his enhanced benefit as union president and the fact that it would not apply to future presidents. Dennis Pascale, a union member and fire captain who attended that meeting, was concerned about that additional benefit. He shared his concerns with Billy Davis, another fire captain. Davis was also upset about the presidential benefit because "[w]e were already paying him to be our negotiator, and then on top of his union salary he was going to get this benefit that was only applicable to himself and it wouldn't apply to, say, any other fire department captains."
 Pascale and Davis wrote a letter to the City's ethics commission regarding this "special `one time' benefit" that Saathoff would receive. The letter complained that "[t]he recent negotiations have been compromised. The buyoff of the [F]irefighter[s'] lead negotiator is a clear violation of ethics ordinances. The self-approval of his special package at the Retirement Board is clearly a conflict of interest." *Page 1439 
 In July the City's ethics commission issued a preliminary review. In that review the author stated, "Any actions on Mr. Saathoff's part in his capacity as a Retirement Board member to approve his own retirement package would likely constitute a violation of the Ethics Ordinance." However, the ethics commission declined to commence an investigation at that time as no violation had yet taken place, and further stated in its review, "[I]t is my understanding that all retirement benefits are approved by the City council and not the Retirement Board. Thus, it does not appear that Mr. Saathoff, in his capacity as a Retirement Board member, will ever have an opportunity to cast a vote approving his own retirement benefit."
 Michael McGhee, a labor relations officer for the City, was the principal staff person on the negotiations with the unions. He testified that he understood at the time that the incumbent union presidential benefit was contingent on the board lowering the trigger. However, on cross-examination he admitted that he never heard anyone say that the incumbent union presidents' benefit was contingent on anything SDCERS did, nor was there a document that so stated.
 4. Negotiations with POA
 SDCERS boardmember Thomas Rhodes, who represented police safety members, was also a secretary for the POA and had been a police officer for 26 years. He was involved in the negotiations between the City and the POA. He was an active participant who attended most if not all negotiation meetings. The concept of tying enhanced retirement benefits to contribution rate relief by the SDCERS board was discussed at a May 2 meeting. It was presented in writing. Rhodes thought it "wasn't right," stating, "I was a trustee and how — my question was: How does [SDCERS] have a hand in this? So they vote on it, we get it; they don't vote on it, we don't get it. Where does that come from?"
 At a May 9 meeting, the negotiating team was given a document from the City that contained its final position. The document read in part: "[S]ignificant improvements in benefits are contained in the three-year proposal. Consequently, the trigger provisions must be adjusted as a condition of the City's three-year proposal. Therefore, the three-year proposal is contingent upon and subject to approval by the [SCDERS board] of an adjustment to the trigger provisions contained in [MP1]."
 E. The May 29 SDCERS Board Meeting
 On May 29 City Manager Uberuaga appeared before the SDCERS board to make a presentation on the City's proposal to modify MP1 to permit a *Page 1440 
lowering of the trigger to 75 percent and seeking a five-year phase-in period for the payment of increased contributions to reach the full actuarial rate if the trigger were hit.
 All 13 board members were present at the meeting. Boardmember Diann Shipione was appointed to the board of SDCERS in 1997 and reappointed in 1999. She was not a City employee and therefore never benefited from the retirement system. She worked as a vice-president of investment at UBS Financial Services in La Jolla. Shipione did not have any involvement in the unions' meet-and-confer process.
 Boardmember Richard Vortmann had been the president of National Steel and Shipbuilding Company, a San Diego-based shipbuilder, for 22 years. He had no involvement in the unions' negotiations with the City.
 Boardmember David Crow sat on the board as an elected representative of the retired members of the system. Ray Garnica sat on the board as a City council appointee. He worked for United California Bank and had never worked for the City. Frederick Pierce IV was appointed to the board in 1997 by the City council. In 2002 he was president of the board.
 At the meeting, Lexin explained to the other board members the purpose of Uberuaga's presentation: "[T]he City Manager is basically planning to introduce a concept for lowering the funding floor under the City Manager's Proposal of 1997. His recommendation will come before the board for action next month." She added that a number of benefits increases coming out of the meet and confer process are tied to the board adopting this proposal, which the labor organizations will support. "Fiduciary counsel and the actuary will be asked to review this proposal and be prepared to address these recommendations in writing."
 Uberuaga requested that the board amend the trigger to 75 percent. He told the board it was part of the tentative labor agreements with three of the four labor groups in the City. The City's request was then reduced to writing and submitted to the board. The written proposal from Uberuaga stated: "[T]he City agreed to benefit enhancements through labor negotiations which have impacts on retirement funding, and consequently these benefit enhancements were offered contingent upon successfully addressing the potential `trigger' in [MP1]."
 Shipione understood that the proposal that the board provide contribution relief was linked to the conferring of benefits tentatively agreed to during negotiations between the unions and the City. She also believed that the proposal meant less money coming into the pension plan at the same time increased benefits were being promised. *Page 1441 
 When boardmember Rhodes heard the presentation he understood that for the unions to obtain what they were seeking in negotiations, SDCERS would have to approve the contribution relief requested by the City. He believed that "to have [SDCERS] involved in this process was just . . . wrong."
 Boardmember Vortmann did not know that the City was going to request a modification of the MP1 until he was at the May 29 meeting. After Uberuaga's presentation he understood that increased retirement benefits were "explicitly tied" to the board granting contribution relief. He testified that he "was extremely upset about the request." He "felt it highly inappropriate that we, as trustees, who have no business setting benefits, were put in a position where the beneficiaries of the system and the current employees . . . were promised something contingent upon our actions." During the meeting Vortmann "took exception to the concept."
 Boardmember Crow was also concerned about the idea of granting rate relief in exchange for benefits. Boardmember Garnica "felt the City had placed the board in a very awkward position."
 Board president Pierce testified that "[i]t was very clear from the meeting of the Board on the 29th [of May] that the principle, that the restructuring of [MP1] would be linked to a benefit increase was unacceptable to the Board. . . ." After the meeting Pierce asked for a meeting with Deputy City Manager Herring. On June 7 a meeting was held with Pierce, SDCERS administrator Grissom, Herring and Lexin present. Pierce requested the meeting because he felt a linkage was inappropriate and "that we have no interest and no role in the setting of benefits. . . ." During the meeting Pierce told Herring, "Get that linkage the heck out of here. We don't want anything to do with it." Herring responded, "I don't think the City Council will go for that."
 The board's fiduciary counsel, Robert Blum, was also critical of the City's proposal. In a letter dated June 12, he advised the board that adoption of the proposal would pose a "material risk that a court would find that approval by the Retirement Board of the proposed amendment including the reduction in the `floor' in [MP1] to 75 [percent] was not a prudent exercise of the Board's fiduciary responsibilities, particularly if insufficient mitigating actions were taken by the Board." With regard to the City conditioning benefit increases on the board accepting the proposed amendment to MP1 he stated: "[I]t is inappropriate for the City to put the Board into the position of essentially accepting or rejecting a particular benefit structure by accepting or rejecting a particular modification to the City's contribution requirements. This puts the Board into the middle of benefit determination and suggests that sound actuarial principles should be modified to accommodate benefit increases. Neither decision is within the role of the Board." *Page 1442 
 In response to criticisms of the City's proposal, the City modified its proposal to include an acceleration of the rate at which the City was to increase its contribution from 0.5 percent to 1 percent of payroll, regardless of whether the trigger were hit. That modified proposal was presented to the board on June 21 by Herring.
 F. The June 21 SDCERS Board Meeting
 In opening the meeting, Deputy City Manager Herring stated the following with regard to the connection between the City's negotiations with the labor unions and the City's current proposal to the SDCERS board: "[T]his proposal is in the context of some labor negotiations that were completed recently with most of the [C]ity employee's labor representatives, and that was a deal between the [C]ity and the labor representatives. [¶] What's before you today is [sic] the implications as it relates [sic] to the system and the trigger, and it's [sic] really separate and apart but obviously related to those labor packages that are contracts between the [C]ity and the labor organizations."
 Also before the board's discussion of the City's proposal began, retirement administrator Grissom advised the board that it was not voting on benefits: "Just, very, very briefly [s]o that there's no misunderstanding on anyone's part, the issues evolved out of the meet-and-confer process. A number of benefit improvement enhancements were agreed upon in the meet-and-confer process, but those — the utilization of those were made contingent upon this Board adopting the funding proposal, the modification of the original [MP1], as Mr. Herring presented it to you. [¶] Just to make sure everyone understands, the Board in approving or disapproving this is not approving or disapproving the benefits. That is not within the Board's area of responsibility. Benefits are approved by the council. They are not approved by the Board. We administer the benefits. What you're being asked to do is to approve a funding mechanism behind the implementation of those benefits."
 Next, SDCERS's actuary Roeder made a presentation to the board. Roeder asked the board two questions: (1) "Should the role of the fiduciary . . . be largely independent of the setting of existing or potential benefit levels?"; and (2) "[S]hould funding status issues be independent of benefit levels?" To both of these questions he answered, "[Y]es."
 Fiduciary Counsel Blum reiterated his concerns about approval of contribution relief being a possible breach of their fiduciary duties, as well as his concern that benefit enhancements were tied to the board's vote on the proposed modification to the MP1. In this regard, Blum told the board that there was "a material risk that if this were to be litigated . . . the court would *Page 1443 
find that approval by the Board of . . . the manager's proposal was not a prudent exercise of the Board's fiduciary duties. . . ." He also told the board that, "one of the reasons that this is such an awkward decision is . . . negotiations and fiduciary decisions have been brought together." He reminded the board, "Your job is in fact to administer the fund as best you can, to set the funding standard, and then let the negotiators work with that funding standard."
 Following a lengthy discussion of the City's proposal, the board did not vote to approve the proposal, but decided to seek more information and analysis. A decision on the proposal was trailed for a special meeting to be called later. All of petitioners, with the exception of City treasurer Vattimo, were present and participated in the meeting.
 G. The July 11 SDCERS Board Meeting
 The special SDCERS board meeting was scheduled for July 11. Prior to the meeting, boardmember Vortmann wrote a letter to the other board members, which was forwarded to the City, with questions he wanted answered at the special meeting. One question inquired: "Given everyone's (on the Board, Counsel, Actuary) feeling the Board should not be put in the middle of labor negotiations, particularly when we now become the `go-no go,' ask the City Manager to come and explain why they put the Board in this position; why was it necessary; and given their `lessons learned' how do they intend to conduct union negotiations in the future differently to prevent a reoccurrence of this inappropriate situation?"
 Another question asked: "Ask the City to speak to the basic issue here: [¶] The City has chosen to increase employee benefits. . . . These improvements in benefits are not the problem. The problem is simply that the City does not want to pay currently for what they want to give the employees. They clearly are addicted to the `give now, pay later' or `burden the future year's taxpayers' when they no longer have any say in the decision — i.e. the decision being locked down now, with the mandatory bill being paid later. [¶] Since the City is in essence asking the Board to be an `enabler' to the City in their `addiction', the Board at least deserves to hear everybody enunciate the truth — not a bunch of smoke about tough economic times, the State is screwing us, etc."
 Shipione received Vortmann's letter and shared his concerns.
 Deputy City Manager Herring sent a memorandum to retirement administrator Grissom on July 3 that answered some of the questions that Vortmann had asked in his letter. In response to Vortmann's question regarding the *Page 1444 
board being placed in the middle of labor negotiations, Herring responded: "The City, through labor negotiations, agreed that the 2.50% at age 55 is an appropriate benefit to bestow. The City, however, was not willing to grant this benefit, given the cost, if at the same time, it might be facing a jump in retirement contribution rates to full actuarial rate (+$25 million) as a result of the `trigger.' Consequently, the City agreed contingent upon the resolution in this proposal, [¶] The City did not set out to place the SDCERS Board in an uncomfortable situation. The interrelatedness of issues is inherent in the make up of the Board which is established in the City Charter. Such make up is common on public agency retirement boards, [¶] The City is working to address the declining funding ratio. The City and SDCERS should approach this situation as partners toward a mutual objective of properly funding its retirement system."
 Vortmann thought this response was "totally disingenuous," "insulting," and not credible because benefits were still tied to rate relief.
 Prior to the July 11 board meeting, the City was aware of a possible counterproposal to the City's proposal to come from a board member at that meeting, witnessed by a memorandum sent by Lexin and Deputy City Attorney Heap to the mayor and City council that read in part: "Based on our conversations with the Retirement Administrator, we anticipate a motion from a Board member which would further modify the proposal before the Board, by eliminating the request to lower the funded ratio floor, and including the five year phase — in if the trigger (82.3% funded ratio) is effectuated, [¶] Given the importance of avoiding an immediate full rate implementation (versus five year phase in), it is recommended that the Council authorize staff to agree to this modification should the proposal currently before SDCERS not prevail. If this additional modification is necessary, staff would ask that if the funded ratio trigger occurs in the upcoming June 30, 2002 valuation, that the phase in of full actuarial rates not begin until FY05. [¶] If this modification is acceptable to the Board and Fiduciary Counsel, the practical impact on the City would be no different than the previously authorized City position. Under either scenario, there would not be any increase to the City contribution rate until FY05."
 All board members were in attendance at the beginning of the July 11 meeting. Administrator Grissom first told the board that the City and labor organizations had "agreed to some benefit enhancements which were subject to the Board's approval of a modification to [MP1]." He then reminded the board that "[i]t is important for everyone to know that it is not the role or function of the retirement Board to approve benefits. That is . . . through the meet and confer process, ultimately to the city council, ratified by the employee organizations, and that sort of thing, [¶] The issues that the Board *Page 1445 
is addressing are only those issues that relate to the financing of those benefits, the employer contributions, and how they are paid. There are many variations on this thing, and we'll be seeing a lot of information further on. But I want to make sure that everyone keeps that distinction in mind."
 Deputy City Manager Herring then presented the City's modified proposal. As he began his presentation he also reminded the board that the City was not asking it to approve retirement benefit enhancements: "[W]e are not asking you today to approve the [memorandum of understanding] or to approve benefits with the employees. That has already been done by the mayor and the city council. That has already been ratified by the labor organizations, [¶] What we're asking you to do is to modify the existing [MP1] as it relates to City contribution rate scenarios."
 The board discussed in detail the merits of the existing MP1, the City's proposal to reduce the trigger to 75 percent, and an alternative funding mechanism presented by the board's actuary, Roeder. On several occasions the board's fiduciary counsel, its administrator, and individual members of the board reminded the board as a whole that it was only to consider the substantive merits of the different funding proposals and not to consider the proposed benefit increase as that was not within the board's province.
 Roeder was concerned, as he was at the June 21 meeting, about the City's request for contribution relief. Fiduciary Counsel Blum was of the opinion that if the board accepted the City's proposal, there was a "material risk" that a court would find that the board did not properly exercise its fiduciary responsibility.
 Union Attorney Smith attended the July 11 SDCERS board meeting on behalf of MEA and spoke in support of the City's proposal to lower the trigger to 75 percent. Ed Lehman, a union representative for Local 127, also spoke on behalf of the City's proposal. City employee Mike Gannon told the board that he was waiting for the issue to be resolved before he retired.
 Lexin made a motion to accept the City's proposal to lower the trigger to 75 percent, which was seconded by Webster. Boardmember Garnica later made an amendment to the motion to make it contingent upon written confirmation from the City that it would indemnify the board for any lawsuits arising out of actions taken by the board on this issue.
 Several members of the board, including Saathoff, expressed an intent to vote against the City's proposal. As Saathoff put it, "[T]his proposal, as it[']s currently written doesn't appear to pass muster in terms of fiduciary counsel's opinion and frankly, the actuary's." He told the board that the City's proposal *Page 1446 
was not within what he considered a "fiduciarily prudent guideline and should the motion not be successful, I will have another motion to make that hopefully will address the [C]ity's concerns and give us comfort that the actions we are taking are fiduciarily prudent as members of this board."
 Shipione made a formal motion to continue the matter. Saathoff opposed the motion indicating that he thought it important to move forward with the matter. Shipione's motion was not seconded.
 Saathoff then made his substitute proposal, which, with some changes, ultimately came to be known as MP2. He moved that the 82.3 percent trigger be kept in place, but in the event the trigger was hit, the City would have five years to reach the actuarial rate, rather than have to pay the $25 million balloon payment. It was also subject to fiduciary counsel's and the actuary's approval, as well as a written contract to be negotiated with the City.
 After substantial further discussion, the motion to adopt the City's proposal was withdrawn and Saathoff's proposal was adopted by a vote of eight to two. Casey, Pierce, Vattimo, Saathoff, Wilkinson, Torres, Webster and Lexin voted in favor of the proposal. Rhodes and Crow opposed the motion. Garnica abstained. Shipione and Vortmann left the meeting before the vote.
 H. Ongoing Negotiations over Proposal
 From July 11 to November 15, Fiduciary Counsel Blum negotiated with the City over memorializing Saathoff's proposal as a written agreement. During this time period there were substantial stumbling blocks and it was far from certain that an agreement would be reached.
 I. Benefit Enhancements Become Final
 Final MOU's (memoranda of understanding) between the City and the unions, effective July 1, were signed by the City and unions. POA, Firefighters and MEA signed the final MOU's on October 7. The final MOU's were not contingent upon any action by the SDCERS board. On October 21 the City council voted unanimously to adopt and approve the MOU's. They also enacted the incumbent presidential benefit without any reference to contingencies or action by the SDCERS board.
 J. The November 15 SDCERS Board Meeting (Approval of MP2)
 On November 15 the SDCERS board was presented with a draft of MP2, which, with some minor changes, essentially reflected the terms of Saathoff's counterproposal. All board members were present at the meeting with the *Page 1447 
exception of Lexin. Each board member was presented with a packet containing the MP2, an opinion from Fiduciary Counsel Blum, and an opinion from actuary Roeder.
 Blum gave a presentation to the board emphasizing the MP2's advantages over MP1, including a doubling of the contribution rate, and a date certain by which the City had to accomplish full actuarial funding. Some additions to Saathoff's proposal had been made in the proposed MP2, including retention of the right of the board to nullify the agreement, and a provision requiring the City to pay any costs incurred to secure enforcement of the agreement's terms. In response to a question from Shipione regarding whether it was appropriate to have a transition period over which the City reached full actuarial funding, Blum opined that the MP2 represented a "proper exercise" of the board's fiduciary duties.
 In response to a question from boardmember Crow asking if actuary Roeder's letter evidenced some hesitancy on his part concerning that agreement, Roeder stated, "[I]t is a legitimate purpose of a Board to look at contribution relief needs of the plan sponsor [the City], totally legitimate, part of the collective bargaining process, to look at enhanced benefits for members. But I hope the Board never enters into a situation where they are inextricably linked to each other. I do think that is inappropriate. I hope this Board never does that again." Blum then told the board that he tried unsuccessfully to get the City to agree to language stating that "the City would agree not to bargain additional benefits conditioned on some approval of funding relief. . . ."
 Shipione then responded that she believed that linking contribution relief with benefit increases was "ethically questionable, if not outright corrupt." She went on, "I am not opposed to the increase. I am opposed to the methodology, [¶] And my message back to whomever dreamed up that idea at the City is I think it is corrupt, period."
 A vote on the MP2 was taken. Saathoff, Vattimo, Torres, Webster, Pierce, Crow, Garnica, Casey and Vortmann voted for the contract. Shipione and Rhodes voted against it. The final MP2 agreement, that the 82.3 percent trigger be kept in place, but in the event the trigger was hit the City would have five years to reach the actuarial rate rather than have to pay the $25 million balloon payment, was approved by the City and signed by the board on December 3 and the City on December 11.
 K. Court's Ruling at End of Preliminary Hearing
 Based upon the foregoing facts elicited at the preliminary hearing, the court found a "reasonable suspicion" to believe petitioners had violated *Page 1448 
section 1090. In doing so, the court noted that the relevant contract at issue was not just MP2, but also the pension benefit increases that the City had made contingent upon the board granting the City contribution relief. The court also found that the board's duty was "not to set pension benefits. Their sole duty . . . was to protect the fund . . . to [ensure] there will be money for all of these employees who are retired and those who will be retiring in the future." Additionally, the court found that petitioners could be liable even if their names were not on the relevant contract, but because they had participated in the execution of the agreement, or influenced its execution, directly or indirectly, to promote their personal interests. As the court stated, "[I]f you engage in negotiations, discussions, reasoning, planning, or any give-and-take beforehand in the making of the agreement to commit yourself, then you are part of the making of the agreement."
 The court found that there were sufficient facts presented to support a reasonable suspicion that petitioners were financially interested in the contract "because the contingency was always there." "They were financially interested in this agreement because it increased their pension benefits. And . . . these benefits were contingent upon the passage of rate relief."
 The court rejected petitioners' defense that the salary exception in section 1091.5(a)(9) applied. The court found that pension benefits did not constitute "salary" within the meaning of that statute because the Legislature, although it had the opportunity to do so, never included pension benefits within that section. As to petitioner Saathoff, the court found that it was a "question of fact" as to whether his individual benefit as union head was also contingent upon the board granting the City contribution relief. The court dismissed two of the three counts in the information, finding that there could be only one violation of section 1090, not three.
 L. Court's Ruling Denying Motion to Set Aside Information[5]
 Petitioners thereafter brought, under Penal Code section 995, their motion to set aside the information, arguing that (1) Government Code section 1090 did not apply to their actions and (2) Government Code section 1091.5(a)(9) *Page 1449 
applied to make their actions exempt from section 1090's prohibited financial interests in contracts because pension benefits were within the definition of "salary."[6]
 In August 2006 the court denied petitioners' motion to set aside the information, finding there was "probable cause to believe that the [petitioners] violated [section 1090]."
 The court first noted that even though petitioners in the end rejected lowering the trigger to 75 percent, they could still be held liable under section 1090: "The financial wisdom and the actuarial prudence of the actions of the six defendants concerning the trigger provision are not at issue in this case, nor are the fiduciary obligations of the six defendants. It does not matter what actions the defendants took concerning the trigger provision, [¶] The Section 1090 violation is alleged to have occurred because, on July 11, 2002, each defendant took under consideration the trigger percentage for the employer contribution contract, in which he or she had a financial interest. [¶] In May of 2002, in tentative [MOU's] with its employees, the City agreed to enhance retirement benefits for City employees, including the six defendants. The City conditioned the enhancement of the retirement benefits on obtaining the Retirement Board's approval of a 75% trigger (`MOU Contingency Provision'), [¶] If the Retirement Board approved a 75% trigger for the employer contributions contract, the six defendants would be satisfying the MOU Contingency Provision and furthering their personal financial interest in receiving the enhanced retirement benefits in the tentative MOUs. This personal financial interest conflicted with defendants' responsibility as board members, when approving the amount of the trigger, to be concerned only with the protection of the financial viability of the retirement system."
 The court then described the elements of a case under section 1090: "1. At a specified time, a contract was made by the government; [¶] 2. The defendant was an officer, employee, or member of a board or body of one of the following: the state, a county, a district, a judicial district, or a city; [¶] 3. The governmental contract was made as a result of action by the defendant in his or her official capacity, or by the body or board of which the defendant was a member; [¶] 4. The defendant had a financial interest in the contract; and [¶] 5. The defendant acted willfully." *Page 1450 
 The court identified the November 18 MP2 contract as satisfying the first element. As to the second element, the court found that each petitioner was a member of the SDCERS board during 2002.
 On the third element, the court found that the actions of petitioners at the July 11 meeting constituted the "making of a governmental contract," specifically the MP2, because, even though it was not signed on that date, they debated and discussed the City's 75 percent trigger proposal, agreed on keeping the 82.3 percent trigger, and directed that the 82.3 percent trigger be placed in the future MP2.
 On the fourth element, the court found that petitioners had a financial interest in the proposed MP2 because, "[s]o long as the MOU Contingency Provision existed unsatisfied, the expectancy in enhanced retirements gave each of the [petitioners] a Section 1090 financial interest in the trigger provision to be included in a new employer contributions contract." Thus, the court found the "tentative MOUs gave each of the six defendants an expectancy of enhanced retirement benefits agreed to by the City." The court also found that the "City delegated to the Retirement Board the decision of whether the City employees, including the six defendants, would receive the enhanced retirement benefits" and that decision "was not within the scope of financial interests properly to be considered by the Retirement Board."
 The court found that after the contingencies were removed from the MOU's and they were approved by the City council on October 21, petitioners no longer had a section 1090 conflict. Specifically, the court found that on November 15, the date MP2 was approved, petitioners "were no longer under the [s]ection 1090 prohibition that arose out of the existence of the MOU Contingency Provision."
 The court also found there was evidence that "one or more" petitioners had another financial interest not arising from the MOU contingencies. The court found that petitioners had a financial interest in the MP2 because there was evidence presented that prior to the July 11 meeting one or more petitioners were advised that if they approved an 82.3 percent trigger and a five-year phased payment plan, City employees would receive enhanced retirement benefits. The court found a section 1090 violation could be based upon petitioners' actions between July 11 and November 15 when they "participated in the making of the MP2.
 The court found there was evidence that petitioners acted willfully because at the July 11 meeting they knew that an action taken by them at the meeting could satisfy the MOU contingencies.
 The court rejected petitioners' argument that a financial interest in enhanced retirement benefits fell within the salary exception to prohibited *Page 1451 
financial interests. The court based its finding on the fact that prior to 1999, section 1091.5(a)(9) stated that "compensation for employment with a governmental agency" constituted a noninterest, but in 1999 it was amended to state that "salary, per diem, or reimbursement for expenses from a government entity" constituted a noninterest. The court reasoned that "salary, per diem or reimbursement for expenses" constituted a "more narrowly defined class of benefits" than "compensation," and therefore the Legislature intended not to include pension benefits within the scope of exemptions included within section 1091.5(a)(9).
 DISCUSSION I. STANDARD OF REVIEW "The purpose of a motion to set aside the accusatory pleading under Penal Code section 995 is to review the sufficiency of the indictment or information on the basis of the record made before the grand jury in the one case or the magistrate at the preliminary hearing in the other." (People v. Crudgington (1979) 88 Cal.App.3d 295, 299 [151 Cal.Rptr. 737]; see People v. Sherwin (2000) 82 Cal.App.4th 1404,1411 [98 Cal.Rptr.2d 888].) "[I]n proceedings under [Penal Code] section 995 it is the magistrate who is the finder of fact; the superior court has none of the foregoing powers, and sits merely as a reviewing court; it must draw every legitimate inference in favor of the information, and cannot substitute its judgment as to the credibility or weight of the evidence for that of the magistrate. [Citation.] On review by appeal or writ, moreover, the appellate court in effect disregards the ruling of the superior court and directly reviews the determination of the magistrate holding the defendant to answer. [Citations.]" (People v.Laiwa, supra, 34 Cal.3d at p. 718; see People v. Scott (1999)76 Cal.App.4th 411, 415-416 [90 Cal.Rptr.2d 435].)
 Thus, here we are reviewing the magistrate's initial decision as to probable cause. (People v. Scott, supra, 76 Cal.App.4th at p. 416.) "`[E]very legitimate factual inference must be drawn to uphold the magistrate's decision.'" (Ibid.) "If there is some evidence to support the magistrate's order, the reviewing court will not inquire into its sufficiency." (Ibid.)
 We will not set aside an information so long as "a reasonable person could harbor a strong suspicion of the defendant's guilt." (Cooley,supra, 29 Cal.4th at p. 251.)
 "However, where the facts are undisputed, the determination of probable cause `constitute[s] a legal conclusion which is subject to independent review *Page 1452 
on appeal.' [Citation.]" (People v. Superior Court (Bell) (2002)99 Cal.App.4th 1334, 1339 [121 Cal.Rptr.2d 836].)
 II. SECTION 1090 AND ITS EXCEPTIONS Section 1090 provides in part: "Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members. Nor shall state, county, district, judicial district, and city officers or employees be purchasers at any sale or vendors at any purchase made by them in their official capacity."
 Section 1090 codifies the common law prohibition against "self-dealing" with respect to contracts. (See Stats. 1851, ch. 136, § 1, p. 522; BreakZone Billiards v. City of Torrance (2000)81 Cal.App.4th 1205, 1230 [97 Cal.Rptr.2d 467]; Stigall v. City ofTaft (1962) 58 Cal.2d 565, 571 [25 Cal.Rptr. 441, 375 P.2d 289]; City ofOakland v. California Const. Co. (1940) 15 Cal.2d 573, 576 [104 P.2d 30];Stockton Plumbing Supply Co. v. Wheeler (1924) 68 Cal.App. 592, 597
[229 P. 1020].) Conflict of interest laws such as section 1090 exist to ensure that the government's decisions are made in the public's best interest without regard to potential personal financial gain: "The object of section 1090 of prohibiting individuals `from being financially interested in any contract made by them in their official capacity or by the body or board of which they are members is to insure absolute loyalty and undivided allegiance to the best interest of the [government agency] they serve and to remove all direct and indirect influence of an interested officer as well as to discourage deliberate dishonesty. [Citations.]' [Citation.]" (Thorpe v. Long Beach Community CollegeDist. (2000) 83 Cal.App.4th 655, 659 [99 Cal.Rptr.2d 897].)
 "The evil to be thwarted by section 1090 is easily identified: If a public official is pulled in one direction by his financial interest and in another direction by his official duties, his judgment cannot and should not be trusted, even if he attempts impartiality." (CarsonRedevelopment Agency v. Padilla (2006) 140 Cal.App.4th 1323, 1330 [44 Cal.Rptr.3d 881].) "`In our society, people of ordinary sensibility should recognize, without the intervention of a criminal proscription, that a public official is a trustee and that it is wrong for such a trustee to engage in self-dealing, including the contingent feathering of one's own nest.' [Citation.]" (People v. Chacon (2007) 40 Cal.4th 558, 570
[53 Cal.Rptr.3d 876, 150 P.3d 755], original italics.)
 "[T]he prohibited act is the making of a contract in which the official has a financial interest." (People v. Honig (1996)48 Cal.App.4th 289, 333 [55 Cal.Rptr.2d 555] (Honig).) "Put in ordinary, but nonetheless precise, terms, an *Page 1453 
official has a financial interest in a contract if he might profit from it." (Ibid.; accord, People v. Gnass (2002) 101 Cal.App.4th 1271, 1288, fn. 6 [125 Cal.Rptr.2d 225].)
 Prohibited "financial interests" extend to expectations of economic benefit. (Honig, supra, 41 Cal.App.4th at p. 315.) "[A] financial interest within the meaning of section 1090 may be direct or indirect and includes the contingent possibility of monetary or proprietary benefits." (Id. at p. 325; see People v. Vallerga (1977) 67 Cal.App.3d 847, 865
[136 Cal.Rptr. 429]; People v. Darby (1952) 114 Cal.App.2d 412, 433, fn. 4 [250 P.2d 743].) "[F]orbidden financial interests may . . . involve financial losses, or the possibility of losses, as well as the prospect of pecuniary gain." (86 Ops.Cal.Atty.Gen. 138, 140 (2003).)[7] All the circumstances of the transaction as a whole must be considered in determining whether a proscribed financial interest would be present in the contract. (Thomson v. Call (1985) 38 Cal.3d 633, 644-645 [214 Cal.Rptr. 139, 699 P.2d 316]; Honig, supra,48 Cal.App.4th at pp. 315, 320; People v. Watson (1971)15 Cal.App.3d 28, 37 [92 Cal.Rptr. 860]; People v. Darby, supra,114 Cal.App.2d at pp. 431-432.)
 "In considering conflicts of interest [courts] cannot focus upon an isolated `contract' and ignore the transaction as a whole." (Honig,supra, 48 Cal.App.4th at p. 320.) Courts "look? past the individual contracts in question and consider? the relationships between all the parties connected with them, either directly or indirectly, to determine if a conflict of interest existed." (People v. Gnass, supra,101 Cal.App.4th at p. 1294; see also Campagna v. City of Sanger (1996)42 Cal.App.4th 533, 541 [49 Cal.Rptr.2d 676]. Thus, courts should not be "concerned with the technical terms and rules applicable to the making of contracts, but instead [with] rules governing the conduct of governmental officials." (Honig, supra, 48 Cal.App.4th at p. 314.) "We must disregard the technical relationship of the parties and look behind the veil which enshrouds their activities in order to discern the vital facts. [Citation.] However devious and winding the trail may be which connects the officer with the forbidden contract, if it can be followed and the connection made, a conflict of interest is established." (Peoplev. Watson, supra, 15 Cal.App.3d at p. 37.) *Page 1454 
 A. A Reasonable Person Could Harbor a Strong Suspicion Petitioners' Actions Violated Section 1090
 While the MP2 contract between the City and SDCERS itself did not directly involve a financial interest relating to defendants, we must look at the transaction as a whole. The allegation is, and the evidence presented at the preliminary hearing shows, drawing every reasonable inference in favor of the information, a reasonable person could harbor a strong suspicion that enhanced benefits in which each defendant did have an interest were contingent upon SDCERS's approval of MP2. Because of the broad scope of section 1090, it matters not that petitioners were not parties to the contract between the City and the labor unions. "[S]ection 1090 applies even when a public official's financial interest flows from a source that is independent of a public contract." (Carson RedevelopmentAgency v. Padilla, supra, 140 Cal.App.4th at p. 1334.) "The phrase `financially interested' broadly encompasses anything that would tie a public official's fortunes to the existence of a public contract." (Id. at p. 1335.)
 What is important under section 1090 is whether petitioners stood to gain something personally with respect to the contract between SDCERS and the City, a contract over which petitioners could exercise influence. As the court found on this issue, "the evidence contained in the preliminary hearing provides a rational ground for assuming the probability that on July 11, 2002, each of the [petitioners] proceeded to act on the City's proposal for a 75% trigger, knowing that an action by the Retirement Board could also satisfy the MOU Contingency Provision and thereby remove the condition on the [petitioners'] receiving their enhanced retirement benefits agreed to in the MOUs."
 Further, it matters not, as petitioners claim, that at the time MP2 was actually signed, the contingencies in the MOU's were gone. Section 1090's broad scope encompasses "the planning, preliminary discussion, compromises, drawing of plans and specifications and solicitation of bids that led up to the formal making of the contract." (Honig, supra,48 Cal.App.4th at p. 315; see also Thomson v. Call, supra,38 Cal.3d at pp. 644-645 [successive contracts were considered part of a single multiparty agreement for purposes of § 1090].) As we stated inCity Council v. McKinley (1978) 80 Cal.App.3d 204, 212 [145 Cal.Rptr. 461], "the negotiations, discussions, reasoning, planning, and give and take which go beforehand in the making of a decision to commit oneself must all be deemed to be a part of the making of an agreement in the broad sense [citation]. . . . If the date of final execution were the only time at which a conflict might occur, a city councilman could do all the work negotiating and effecting a final contract which would be available only to himself and then present the matter to the council, resigning *Page 1455 
his office immediately before the contract was executed. He would reap the benefits of his work without being on the council when the final act was completed. This is not the spirit nor the intent of the law which precludes an officer from involving himself in the making of a contract. The statutes are concerned with any interests, other than perhaps a remote or minimal interest, which would prevent the officials involved from exercising absolute loyalty and undivided allegiance to the best interests of the city [citation]."
 Viewed in isolation, petitioners' mere presence at the May 29, June 21 and July 11 board meetings would not have been sufficient to support a section 1090 prosecution. Similarly, their vote taken on November 15, taken on its own, also might not support a section 1090 action as the contingencies in the MOU's had been removed by that time. However, "[i]n considering conflicts of interest [courts] cannot focus upon an isolated `contract' and ignore the transaction as a whole." (Honig, supra,48 Cal.App.4th at p. 320.)
 Thus, we look at the continuing course of conduct from May 29 through November 15. If the evidence the People presented at the preliminary hearing arguably shows that (1) petitioners participated in the making of MP2, (2) they had a financial interest in that contract because increased pension benefits were contingent upon approval of MP2, and (3) they "made" a contract under section 1090 when they voted to approve MP2 on November 15 because they only voted to approve the contract because of the increase in retirement benefits, the People have stated a claim for violation of section 1090 sufficient to withstand a Penal Code section 995
motion to set aside the information.
 The evidence presented at the preliminary hearing was that during the time period between May 29 and November 15 petitioners considered, discussed, and/or negotiated the various proposals at a time when enhanced pension benefits were contingent on their voting to approve contribution relief for the City. The entire course of petitioners' conduct shows that they participated in the making of a contract in which they had a financial interest. That course of conduct ended with the November 15 vote to provide the City with its requested contribution relief. Although the contingencies in the MOU's were formally removed from the MOU's when petitioners approved the MP2, there was sufficient evidence such that "a reasonable person could harbor a strong suspicion of the defendant's guilt" (Cooley, supra, 29 Cal.4th at p. 251.); i.e., that they would not have agreed to the contribution relief but for the City's agreement to increase retirement benefits. That evidence was sufficient to bind petitioners over for trial for a violation of section 1090.
 The penalties for violation of section 1090 are stated in section 1097, which provides: "Every officer or person prohibited by the laws of this state *Page 1456 
from making or being interested in contracts, or from becoming a vendor or purchaser at sales, or from purchasing scrip?, or other evidences of indebtedness, including any member of the governing board of a school district, who willfully violates any of the provisions of such laws, is punishable by a fine of not more than one thousand dollars ($1,000), or by imprisonment in the state prison, and is forever disqualified from holding any office in this state.
 However, "[t]he harsh consequences of section 1090's prohibition are ameliorated in two different ways. First, section 1091.5 describes certain `noninterests,' where if applicable, the contract may be executed because the Legislature has determined that the particular interest is insufficient to merit application of the prohibition. In noninterest situations, the interest does not require the officer's abstention and generally does not require disclosure." (83 Ops.Cal.Atty.Gen. 246, 247 (2000).)
 As we shall explain in the following sections, (1) while pension benefits come under the definition of "salary" under section 1091.5(a)(9), that exception to section 1090 is not applicable under the facts of this case; and (2) pension benefits are not "public services" under section 1091.5(a)(3).
 B. Section 1091.5(a)(9)
 Section 1091.5(a)(9) provides: "(a) An officer or employee shall not be deemed to be interested in a contract if his or her interest is any of the following: [¶] . . . [¶] (9) That of a person receiving salary, perdiem, or reimbursement for expenses from a government entity, unless thecontract directly involves the department of the government entity thatemploys the officer or employee, provided that the interest is disclosed to the body or board at the time of consideration of the contract, and provided further that the interest is noted in its official record." (Italics added.)
 "Hence, under the terms of subdivision (a)(9) of section 1091.5, a government employee who serves on the board of another public agency is deemed not to be financially interested in a contract between the agency and his employer unless the contract directly involves the particular department in which he is employed." (83 Ops.Cal.Atty.Gen., supra, at p. 248.)
 1. Salary includes pension benefits
 The trial court found the "salary" exception to prohibited financial interests inapplicable because when the Legislature amended section 1091.5(a)(9) in 1999, it changed the language "from `compensation' to `salary, per diem or reimbursement for expenses,' a more narrowly defined class of benefits, the Legislature's omission of `pension benefits' indicates the intention not to *Page 1457 
include pension benefits within the scope of the exemption presented in . . . [section] 1091.5(a)(9)." This finding was erroneous.
 The definition of compensation in Black's Law Dictionary is "[r]emuneration and other benefits received in return for services rendered; esp., salary or wages." (Black's Law Diet. (8th ed. 2004) p. 301, col. 1, italics added.) Salary is defined as "[a]n agreed compensation for services — esp. professional or semiprofessional services — usu. paid at regular intervals on a yearly basis, as distinguished from an hourly basis." (Id. at p. 1364, col. 1.) Thus, salary and compensation are largely synonymous terms. Moreover, a pension is defined as "[a] fixed sum paid regularly to a person (or to the person's beneficiaries), esp. by an employer as a retirement benefit." (Id. at p. 1170, col. 1.) Thus, as salary is a type of compensation, and a pension is merely a deferred payment of such salary, pension benefits can be reasonably interpreted as coming within the definition of salary under section 1091.5(a)(9). This conclusion is bolstered by decisions from the California Attorney General's Office, as well as the Political Reform Act of 1974 (PRA), section 81000 et seq.
 In 89 Ops.Cal.Atty.Gen. 217 (2006), the Attorney General was asked to answer the following question: "Where a member of the governing board of a community college district receives retirement health benefits from the district as a former faculty member in an amount that is required by contract to be equal to the amount of health benefits the district provides to current faculty members under the terms of a collective bargaining agreement, may the governing board renegotiate the amount of health benefits provided under the current collective bargaining agreement?" The Attorney General concluded that the member of the board receiving the retirement benefits could not participate in the decisionmaking process regarding the health benefits because to do so would be a violation of section 1090. (89 Ops.Cal.Atty.Gen., supra, at pp. 217-219.) In reaching this conclusion, the Attorney General interpreted the "salary" exception to prohibited financial interests contained in section 1091.5(a)(9). The Attorney General looked to similar language in the PRA, "which generally prohibit[s] public officials from participating in governmental decisions in which they have a `financial interest.' [Citations.]" (89 Ops.Cal.Atty.Gen., supra, at p. 222.) In this regard, the Attorney General stated: "While a `financial interest' within the meaning of the [PRA] is defined to include `[a]ny source of income' (§ 87103, subd. (c)), `income' is defined to exclude `[s]alary . . . received from a state, local, or federal government agency' (§ 82030, subd. (b)(2); see also Cal. Code Regs., tit. 2, § 18705.5 [financial effect of a decision is not material if it affects only the salary, per diem, or reimbursement for expenses that a public official receives from a federal, state, or local governmental entity]). The Fair Political Practices Commission, which administers the [PRA], has determined that retirement benefits are a form of deferred compensation that fall within the *Page 1458 
`salary' exclusion of section 82030, subdivision (b)(2). (In re Moore
(1977) 3 FPPC Ops. [33].)" (89 Ops.Cal.Atty.Gen., supra, at p. 222.) Noting that "[R]etirement benefits `are not gratuities but represent deferred compensation for past service'" (id. at p. 220, fn. 4.), the Attorney General concluded that the term "`salary' may be construed to include a retired employee's health benefits." (Id. at p. 220, fn. omitted.)[8]
 Our own review of relevant provisions of the PRA and case law interpreting it support the conclusion that the term "salary" in section 1091.5(a)(9) includes pension benefits.
 Section 87100 provides: "No public official at any level of state or local government shall make, participate in making or in any way attempt to use his official position to influence a governmental decision in which he knows or has reason to know he has a financial interest."
 An exception to the term "financial interest" is contained in section 82030, subdivision (b)(2), for "[s]alary and reimbursement for expenses or per diem, and social security, disability, or other similar benefit payments received from a state, local, or federal government agency. . . ." The term "salary" in this code section has been defined in regulations promulgated to interpret the PRA as including "any and all payments made by a government agency to a public official, or accrued to the benefit of a public official, as consideration for the public official's services to the government agency. Such payments include . . . pension benefits. . . ." (Cal. Code Regs., tit. 2, § 18232, italics added.)
 In In re Moore (1977) 3 FPPC Ops. 33 [1977 WL 45941], the California Fair Political Practices Commission (the Commission), which enforces the PRA, was asked whether a retired county employee who received a pension from the county and served on the county board of retirement could vote on decisions that could result in enhanced pension benefits. The Commission concluded that he could because pensions benefits are included within the definition of salary under section 82030, subdivision (b)(2): "A pension . . . is essentially a type of deferred salary whereby an employee agrees to receive a smaller payment while working in exchange for the security of receiving the remaining portion of his compensation after he retires. [¶] Since a pension is, in essence, a deferred salary payment, we conclude that it is included in `salary,' as that term is used in Section 82030[, subdivision] (b)(2). We note, moreover, that the pension in the present case is from a local government agency. The retirement fund is simply the accounting mechanism used by the *Page 1459 
county to accumulate and disburse the pension benefits. Accordingly, we conclude that the pension is `salary . . . from . . . a local government' agency and is, therefore, excluded from the definition of income by Section 82030[, subdivision] (b)(2). [¶] Based on the foregoing analysis, it is clear that the pension received by the retired employee from the county retirement system does not constitute a `financial interest' within the meaning of Section 87103. Consequently, the retired employee is not prohibited by Section 87100 from participating in board of retirement decisions" concerning matters that might increase pension benefits. (In re Moore, supra, 3 FPPC Ops. 33, 36-37 [1977 WL 45941], fn. omitted.)
 It is true, as the trial court found, that when the Legislature amended section 1091.5(a)(9) in 1999, it changed the language from "compensation" to "salary, per diem, or reimbursement for expenses." (Assem. Amend, to Sen. Bill No. 689 (1999-2000 Reg. Sess.) June 30, 1999.) However, this does not mean, as the trial court found, that by changing this language the Legislature intended to exclude pensions from section 1091.5(a)(9). Rather, the only rational explanation is that the Legislature sought to more closely track the language of the PRA, which excludes "[s]alary and reimbursement for expenses or per diem . . . from a . . . local . . . government agency . . ." from the definition of prohibited financial interests. (§ 82030, subd. (b)(2).)
 This conclusion is compelled by the fact that the PRA and section 1090 are "in pari materia," which means "`"[o]f the same manner; on the same subject."'" (Honig, supra, 48 Cal.App.4th at p. 327.) "They both deal with a relatively small class of people, public officers and employees, and share the same purpose or objective, the prevention of conflicts of interests, and hence can fairly be said to be in pari materia. [Citation.] [¶] When statutes are in pari materia, they should be construed together as one statute. [Citation.] So interpreted, `. . . all parts of a statute should be read together and construed in a manner that gives effect to each, yet does not lead to disharmony with the others.' [Citation.]" (Ibid.)
 Hence, because the language of section 1091.5(a)(9) and section 82030, subdivision (b)(2) is similar, and they are in pari materia, we must construe them as one, and the definition of salary in both is the same.
 From all the foregoing authority, we conclude that pension benefits are salary within the meaning of section 1091.5(a)(9), and thus not a prohibited financial interest under section 1090, as long as the exception created by section 1091.5(a)(9) is otherwise applicable. We conclude that it is not.
 2. The contract directly involved petitioners' departments
 The noninterest exception of section 1091.5(a)(9) is inapplicable to a contract that "directly involves the department of the government entity that *Page 1460 
employs the officer or employee." Here, the pension benefits increases in the MOU's directly involved the departments of petitioners because they granted benefits to the City departments in which they worked. They received the benefit increases only because of their employment with a particular department.
 This conclusion is better understood when one looks at 78 Ops.Cal.Atty.Gen. 362 (1995), an Attorney General's opinion interpreting the noninterest exception set forth in section 1091.5(a)(9). In this opinion the Attorney General was asked whether "an individual [may] simultaneously serve as a San Bernardino County Sheriff's Deputy Chief and Yucaipa City Councilman," and, if so, "may the city council enter into a contract with the sheriff to provide law enforcement services to the city?" (78 Ops.Cal.Atty.Gen., supra, at p. 362.) The Attorney General opined that the individual could serve as a sheriff's deputy and a city council member at the same time, and in such a situation the city council could enter into a contract with the sheriff's department to provide law enforcement services, but only if the council member/deputy sheriff did not participate in the decisionmaking process: "[Subdivision (a)(9) of section 1091.5 may be construed as allowing a government employee who serves on the board of another public agency to vote on a contract between the agency and his government employer except when the contract involves his particular employing unit. Under this interpretation, the prospective councilman here could not participate in the decision to contract for law enforcement services, since the contract would specifically affect his own employing unit." (78 Ops.Cal.Atty.Gen., supra, at pp. 369-370.)
 In 85 Ops.Cal.Atty.Gen. 115 (2002), another Attorney General opinion discussing the noninterest exception of section 1091.5(a)(9), the Attorney General was asked whether an individual could simultaneously hold the position of city council member and deputy county counsel, and, if so, could the city council enter into a contract with the county to provide law enforcement services. The Attorney General opined that the non-interest exception of section 1091.5(a)(9) applied as to the individual with dual employment as the contract did not directly involve the individual's employing unit: "Hence, a government employee who serves on the board of another public agency is deemed not to be financially interested in a contract between the agency and his or her employer unless the contract directly involves the particular department in whichhe or she is employed. [Citation.] [¶] With respect to the deputy county counsel in question, the provisions of subdivision (a)(9) of section 1091.5 would be applicable since the contract would not directly involvethe deputy's employing unit — the county counsel's office within countygovernment. Thus, the council member's employment with the county counsel's office may be characterized as a `noninterest' *Page 1461 
within the meaning of section 1091.5. . . ." (85 Ops.Cal.Atty.Gen.,supra, at p. 119, italics added, fn. omitted.)
 Because there was sufficient evidence presented at the preliminary hearing from which "a reasonable person could harbor a strong suspicion" (Cooley, supra, 29 Cal.4th at p. 251) that SDCERS voted to approve the MP2 because it was a prerequisite to the City providing enhanced pension benefits, that agreement directly impacted not only all City employees subject to the increased pension benefits, but also each employing unit of petitioners. As in 78 Ops.Cal.Atty.Gen. 362, the financial benefits here were the same for all members of a particular employing unit, and all City employees that were members of the pension system. Thus, section 1091.5(a)(9) does not require that the contract's impact must be personal or unique to petitioners in order for it to be "direct." Each petitioner received the increase in pension benefits only because of their employment with their particular departments. As for Saathoff, if it can be proven that the enhanced pension benefit he received as union president was made contingent upon the SDCERS board approving MP2, the impact to him was not only direct, but personal and unique.
 The purpose of section 1091.5(a)(9)'s exception to prohibited financial interests is to allow government officials to participate in making contracts between two public agencies, so long as there is no ability to self-deal with the entity that controls the official's salary. If, as in 85 Ops.Cal.Atty.Gen. 115, the contract at issue does not directly affect the official's department, there is no danger of self-dealing. Here, however, because evidence was presented from which "a reasonable person could harbor a strong suspicion" (Cooley, supra,29 Cal.4th at p. 251) that approval of increased pension benefits was contingent on petitioners' approval of MP2, there was the opportunity to engage in self-dealing, as petitioners knew that their respective employing units, and themselves personally, would financially benefit from the transaction.
 Because the enhanced pension benefits directly impacted each of petitioners' departments or employing units, the salary exception to section 1091.5(a)(9) does not apply.
 C. Section 1091.5(a)(3)
 Petitioners assert that the "public services" exception contained in section 1091.5(a)(3) applies and therefore their actions do not fall under section 1090. This contention is unavailing.[9] *Page 1462 
 Section 1091.5(a)(3) provides: "(a) An officer or employee shall not be deemed to be interested in a contract if his or her interest is any of the following: [¶] . . . [¶] (3) That of a recipient of public servicesgenerally provided by the public body or board of which he or she is amember, on the same terms and conditions as if he or she were not amember of the body or board." (Italics added.)
 The only published decision to discuss this exception to section 1090 is City of Vernon v. Central Basin Mun. Water Dist. (1999)69 Cal.App.4th 508 [81 Cal.Rptr.2d 650], wherein a member of a municipal water district board, who was also an owner and officer of a private water company, purchased reclaimed water from the district for his company. The Court of Appeal held that the continuing sales of reclaimed water to the company constituted "public services generally provided" within the meaning of section 1091.5, subdivision (a)(3). In doing so, the Court of Appeal stated, "Plaintiff . . . contends that delivery of reclaimed water does not constitute `public services generally provided,' because the reclaimed water is provided only to 23 wholesale purveyors of reclaimed water, of which [defendant] is one. Plaintiff argues that the phrase `public services generally provided' must be construed to mean `services provided to the general public,' or to the `public at large.' We disagree. Plaintiff is advocating that we rewrite the words of the statute. Public agencies provide many kinds of `public services' that only a limited portion of the public needs or can use. This does not derogate from their characterization as `public services' according to the ordinary meaning of those words. The fact that [the water district] distributes reclaimed water through intermediaries does not negate the public service nature of providing reclaimed water. There are 23 purveyors, all of whom are charged the same set rate. This is sufficient to establish that the public services, delivery of reclaimed water, are `generally provided' `on the same terms and conditions as if [the board member] were not a member of the board.' . . . [¶] The parties cite no case construing the `public services generally provided' language of section 1091.5, subdivision (a)(3). But the trial court's conclusion is supported by an opinion of the Attorney General. (80 Ops.Cal.Atty.Gen. 335 (1997).) There the Attorney General said the `apparent intent of this provision is to exempt a board member's receipt of public services that are given under "the same terms and conditions" to the other customers of the public agency.' (Id. at pp. 337-338.) The Attorney General opined the Legislature contemplated `the provision of services in accordance with previously adopted rate schedules applicable to all customers.' (Id. at p. 338.) This describes the public services which [the water district] provided here, delivery of reclaimed *Page 1463 
water at a previously adopted rate applicable to all of [the water district's] customers of reclaimed water." (City of Vernon v. CentralBasin Mun. Water Dist, supra, 64 Cal.App.4th at pp. 514-515, fn. omitted.)
 In 81 Ops.Cal.Atty.Gen. 317, 320 (1998), the Attorney General also reviewed the scope of the public services exception of section 1091.5, subdivision (c)(3), stating: "We have examined the legislative history of the 1961 amendment that added the `public services' exemption to section 1091.5. (Stats. 1961, ch. 381, § 2.) The scope of this exemption is not identified therein. We have previously determined informally, however, that `public services' would include public utilities such as water, gas, and electricity, and the renting of hangar space in a municipal airport on a first come, first served basis. The furnishing of such public services would not involve the exercise of judgment or discretion by public agency officials. Rather, the rates and charges for the services would be previously established and administered uniformly to all members of the public. [Citation.]"
 The Attorney General concluded in 81 Ops.Cal.Atty.Gen., supra, at page 320 that a former city council member who participated in the planning, discussions and city approval necessary to implement a city loan program for developing businesses within the city was precluded from participating in the program, even after he left his position as a city council member. In rejecting the claim that the former city council member's action fell within the no financial interest exception for public services under section 1091.5(a)(3), the Attorney General stated: "Obtaining a government loan involves more complex considerations. The loan applicant must qualify, and the public official approving the loan must exercise some degree of discretion and judgment. Whatever may be the scope of the `public services' exemption of section 1091.5 [(a)(3)], it does not include the extension of a business development loan, where the conditions of the loan would be specific to the particular proposal in question." (81 Ops.Cal.Atty.Gen., supra, at pp. 320-321.)
 Based upon the foregoing authorities, we conclude that pension benefits are not "public services" that are "generally provided" under section 1091.5(a)(3). "Public services" are services provided by the agency to the public, such as water, gas and electricity. (81 Ops.Cal.Atty.Gen., supra, at p. 320.) Here, pension benefits are part of a compensation package that is conferred only on City employees, as opposed to the public, through a contract with the City.
 In considering the City's request regarding contribution levels for the pension system, in exchange for increased pension benefits, petitioners were also required to "exercise some degree of discretion and judgment." (81 Ops.Cal.Atty.Gen., supra, at p. 320.) Thus, petitioners' actions fall outside the scope of section 1091.5(a)(3) for this reason as well. *Page 1464 
 D. Relevance of City Charter Provisions Mandating Composition of Board
 Petitioners assert that because the City Charter mandated that City employees sit on the SDCERS board, they were required, despite their financial interest, to consider MP2 and the contingent increase in pension benefits. This contention is unavailing.
 It is true as petitioners assert, that in 2002, the City Charter, article IX, section 144 provided that the composition of the SDCERS board consist of 13 members consisting of three specifically designated ex officio positions for the City manager, the City treasurer and the City auditor and comptroller; one position designated to represent fire safety members; one for police safety members; one position to represent retired City employees; and three positions to be elected from the SDCERS active membership. The other four board members were drawn from the community and appointed by the City council.
 Petitioners contend that because their presence on the board was mandated by the City Charter, their status as City employees and members of SDCERS required that they consider contracts in which they had a financial interest, therefore creating a conflict under section 1090. They contend that this means either (1) the state in enacting section 1090 voided or preempted article IX, section 144 of the City Charter; or (2) if section 1090 did not void this City Charter article, the legal doctrines of abrogation and preemption preclude prosecution under section 1090.
 However, it was not the composition of the board that created an alleged section 1090 conflict, but petitioners' actions taken when faced with that alleged conflict. It was their financial interest in increased pension benefits that were allegedly tied to their approval of MP2. It is true that petitioners were appointed to represent the interests of labor unions or the City when they became board members. However, once they were on the board, their fiduciary duty ran to all members of the pension system. As stated, ante, it was not within the purview of the board's responsibilities to make decisions on increases in pension benefits. That was exclusively the City's responsibility. (City Charter, art. IX, § 141.) Their exclusive fiduciary duty was to administer SDCERS in an actuarially sound manner for the benefit of members and beneficiaries. If the People can prove at trial that petitioners knew that an increase in pension benefits was contingent upon their approval of MP2, which the People claim was an action that was not actuarially sound, their actions allegedly conflicted with their duties as board members.
 For example, in City of Sacramento v. Public Employees RetirementSystem (1991) 229 Cal.App.3d 1470 [280 Cal.Rptr. 847], the City of Sacramento *Page 1465 
asserted that the California Public Employees' Retirement System (PERS) board's interpretation of a compensation statute resulted in the city being forced to increase its employer contribution, and thus conflicted with the provision in the California Constitution, article XVI, section17, subdivision (b), providing that "[t]he members of the retirement board of a public pension or retirement system shall discharge their duties with respect to the system solely in the interest of, and for the exclusive purposes of providing benefits to, participants and their beneficiaries, minimizing employer contributions thereto, and defraying reasonable expenses of administering the system." (Italics added.) The Court of Appeal held that the "minimizing employer contributions" language did not conflict with a pension board overriding fiduciary duty to protect its members: "The City argues that because PERS's interpretation will increase its costs, it violates [California Constitution, article XVI,] section 17, subdivision (b), because it conflicts with the direction to `minimize employer contributions.' We disagree. The City's argument is an unfounded expansion of the employer minimization provision which ignores its context in the article as a whole. [¶] To date, there has been no judicial interpretation of the `employer minimization' provision, which became part of the California Constitution as a result of a 1984 initiative amendment. . . . We agree with PERS that, even assuming article XVI, section 17 creates a duty tominimize employer contributions, it cannot be construed to require PERSto manage the retirement system in a way which would favor an employerover the beneficiaries to whom it owes a fiduciary duty." (City ofSacramento v. Public Employees Retirement System, supra,229 Cal.App.3d at pp. 1493-1494, fns. omitted, italics added.)
 Further, it was not necessary for petitioners to consider, negotiate or agree to either the original contribution agreement proposed by the City, or the final version that came to be known as MP2, while passage of that agreement was arguably a contingency to the granting of increased pension benefits. When presented with this proposal from the City, petitioners could investigate and seek legal guidance as to whether a conflict existed.[10] That alone would not implicate section 1090. Obviously, a board (or board member) must have sufficient information before it to enable it to determine if a conflict exists. "To act `knowingly' the official must be aware `there is a reasonable likelihood that the contract may result in a personal financial benefit to him.' [Citation.] An official is not required to know that his conduct is unlawful." (People v. Chacon, supra, 40 Cal.4th at p. 570.) If a conflict exists, board members (1) must refuse to consider the proposed contract until the conflict is removed or (2) must abstain from considering or voting on the proposal if the conflict remains; and (3) may not participate in the process *Page 1466 
that leads to the making of the contract in which they have a financial interest. It was not the composition of the board that created the alleged conflict, it was petitioners' alleged actions.
 E. Petitioners' Fiduciary Duties
 Petitioners contend that their prosecution under section 1090 criminalizes the exercise of their fiduciary duties. We reject this contention.
 In support of their position, petitioners rely on this court's decision in Bandt v. Board of Retirement (2006) 136 Cal.App.4th 140 [38 Cal.Rptr.3d 544] and Wilson, supra, 52 Cal.App.4th 1109.
 In Bandt v. Board of Retirement, we recently examined the actions of a county board of retirement in providing benefits for retired county employees. This court concluded that article XVI, section 17, subdivision (b) of the California Constitution did not prevent the county from amortizing the unfunded accrued actuarial liability (UAAL) in the pension trust fund over a 30-year period, thereby allowing "the [c]ounty to grant an increase in benefits and to pay for the increased cost of the benefits over time as the associated pension obligations become due." (Bandt v.Board of Retirement, supra, 136 Cal.App.4th at pp. 158-159.) In reaching this conclusion, we stated: "A decision that increases UAAL is not necessarily bad for members. As the actuary's June 30, 2002 valuation makes clear, the primary cause of the increase in UAAL in the [retirement association's] pension fund in 2002 was an increase in pension benefits valued at approximately $1.1 billion. Obviously, such benefit increases do not harm members. If the [retirement association] were prohibited from increasing UAAL, such benefit increases may not have been granted, since the [c]ounty might have determined that such increases were unaffordable." (Id. at p. 157, fn. omitted.)
 In Board of Administration v. Wilson, the Legislature enacted legislation that allowed the State of California to contribute to the PERS retirement fund 12 months in arrears, as opposed to contributing money in the year that employees' services were rendered. (Board ofAdministration v. Wilson, supra, 52 Cal.App.4th at pp. 1119-1121.) The Court of Appeal held that this violated state employees' right to an "actuarially sound retirement system." (Id. at pp. 1118, 1131.) However, the court contrasted the situation where in exchange for a detrimental contribution change, the pension system receives comparable new advantages: "[The State] argues the trial court erred in ruling that Senate Bill No. 1107 and Senate Bill No. 240 were defective in their failure to provide comparable new advantages in exchange for the adverse effect of in-arrears financing. We disagree, [¶] `"To be sustained as reasonable, alterations of employees' pension rights must bear some material *Page 1467 
relation to the theory of a pension system and its successful operation,and changes in a pension plan which result in disadvantage to employeesshould be accompanied by comparable new advantages. [Citations.]"' [Citation.] `The saving of public employer money is not an illicitpurpose if changes in the pension program are accompanied by comparablenew advantages to the employee.'" (Board of Administration v. Wilson,supra, at pp. 1144-1145, second italics added.)
 From these decisions, petitioners conclude that it is not necessarily a breach of the board's fiduciary duty, and therefore not a violation of section 1090, to grant contribution relief, so long as it is accompanied by a comparable benefit improvement.
 However, a violation of section 1090, under its broad terms "is not limited to instances of actual fraud, dishonesty, unfairness or loss to the governmental entity, and criminal responsibility is assessed without regard to whether the contract in question is fair or oppressive. [Citation.] Thus, it has been repeatedly held that such matters are irrelevant under section 1090." (Honig, supra, 48 Cal.App.4th at p. 314.)
 Accordingly, whether or not petitioners' actions in considering enhanced pension benefits in exchange for decreased contributions constituted a breach of their fiduciary duty to members of the pension system is irrelevant to the question of whether they may be charged under section 1090.
 Further, even petitioners admit that a pension board is not "entitled simply to accept benefit improvements as part of a deliberate decision to undermine the actuarial soundness of a fund." As fiduciary counsel explained to the board prior to its July 11 meeting, "If [this argument] were governing, then each time [an] employer persuaded a Board to reduce contributions, it could avoid challenges by increasing benefits. That would not pass elementary actuarial requirements. Instead, as set out in the Municipal Code, whenever benefits are increased they should be paid for in accordance with standard actuarial practice, so normal cost is paid and past service costs [are] amortized. . . ." As stated, ante, pension members are entitled by law to an actuarially sound pension system, and it was petitioners' fiduciary duty to ensure that result.
 In this matter, evidence was presented at the preliminary hearing from which "a reasonable person could harbor a strong suspicion of the defendants'] guilt" (Cooley, supra, 29 Cal.4th at p. 251) under section 1090 based upon their actions in considering, discussing, negotiating and ultimately voting to approve MP2 because the increase in pension benefits was, under the evidence presented, arguably conditioned on that approval. *Page 1468 
 DISPOSITION The petition is denied. The parties shall bear their own costs in this proceeding.
 McDonald, J., and Irion, J., concurred.
[1] Only two counts were charged as to petitioner Lexin.
[2]All further statutory references are to the Government Code unless otherwise specified.
[3]For 1996 the full actuarial contribution rate was calculated by the City to be 8.6 percent, and it was proposed that the City would contribute 7.08 percent. The proposal was that by the year 2008, the City's contribution would reach the full actuarial rate, which was estimated to be 13 percent.
[4] All further dates refer to the year 2002 unless otherwise specified.
[5]Even though we are not on this writ proceeding reviewing the court's actions in denying the motion to set aside the information, but the magistrate's finding at the preliminary hearing that probable cause existed to hold petitioners to answer the charges (People v. Laiwa (1983)34 Cal.3d 711, 718 [195 Cal.Rptr. 503, 669 P.2d 1278]), for clarity's sake, we set forth the court's reasons for denying that motion.
[6] Penal Code section 995 provides in part: "[T]he indictment or information shall be set aside by the court in which the defendant is arraigned, upon his or her motion, in either of the following cases: [¶] . . . [¶] (2) If it is an information: [¶] (A) That before the filing thereof the defendant had not been legally committed by a magistrate, [¶] (B) That the defendant had been committed without reasonable or probable cause."
[7]Although courts are not bound by the California Attorney General's opinions, they are entitled to "`considerable weight.'" (Thorpe v. LongBeach Community College Dist., supra, 83 Cal.App.4th at p. 662.) "This is particularly true where, as here, the Attorney General regularly advises local agencies about conflicts of interest, and where, as here, no clear case authority exists on the question before us." (People v.Gnass, supra, 101 Cal.App.4th at p. 1304.)
[8]In denning "salary" to include benefits, the Attorney General was interpreting the remote interest exception contained in section 1091, subdivision (b)(13). (89 Ops.Cal.Atty.Gen., supra, at p. 220.) However, the relevant language of the statutes is identical.
[9]Petitioners raised this defense for the first time in their reply papers. The People objected and requested that we strike that portion of their reply brief. However, given the importance of the issue, we permitted the People to file a supplemental brief addressing this issue. Accordingly, as they have now been allowed to fully brief the issue, we deny the People's motion to strike. We grant the real party in interest's motion to take judicial notice of the legislative history regarding the provisions of section 1091.5(a)(3). (Cal. Rules of Court, rule 8.252(a); Evid. Code, § 459.)
[10]We note the California Supreme Court has recently held that advice of counsel is no defense to a section 1090 prosecution. (People v. Chacon,supra, 40 Cal.4th at p. 570 ["reliance on advice of counsel as to the lawfulness of the conduct is irrelevant"].) *Page 1469